# 20-CV-10208
### Introduction to the Case

### ADA and the Rehab Act do not exist in the NYC School.

### Instead, Retaliation to Advocacy is Condoned

August, 2014 - Former SCI Chief Investigator Fennell Condones Retaliation to Advocacy

On Wednesday, August 27, 2014, and on Friday, August 29, 2014, Rubin had phone conversations with Thomas Fennell, Chief Investigator for SCI at the time. By this time, Rubin had filed her first State Special Education Complaint, on behalf of a learning disabled student, at no profit to herself, seeking Mediation. By then the personnel involved had been contacted by NYSED SEQA on the special education complaint, and they had responsively made a new, second (or third?) complaint to SCI. On August 27, Rubin wrote to Investigator Fennell; [Excerpts]

Dear Mr. Fennell;

Thank you for your time on the phone.

I apologize for being close to hysterical. The situation is exceedingly painful. A student and his family are suffering and needlessly so.

In regards the whistleblower status - I need the date for the entry of the complaint against me. Without it I cannot provide the documentation of the chain of events. All I know is the date when the student's mother was called up by one of the Complainers. Given what had transpired, and the amount of my petitioning across NYC Schools for help, it is not possible to view the complaint against me (not) as a retaliation.

The date was never provided. In the conversation on Friday, August 29, Rubin asked him why her students, their parents and herself were being so badly bullied, maltreated and harassed.

He answered:

*… People are upset about your questioning policies, or practices, and think it is inappropriate.*

In other words, they wanted to continue to violate IDEA, and to deprive students of their FAPE rights, with no one speaking up for the students. Mr. Fennell did not seem to think that he should intervene, but planned to send Rubin's concerns to "Dan" - Daniel Schlachet, who handles requests for Whistleblower protection. Schlachet does not review matters in regards to violation of ADA or the Rehab Act. Not then, and not now. These Federal laws just do not exist in the NYC Schools.

**Advocacy, and Retaliation Thereto, Through Writings - Direct Proofs of Linear Causality**

The Plaintiff has, literally, tens of thousands of pages of documents, emails and related reports, documenting with specificity the lawless and unconscionable abuse of process by the Defendants. Any statement of fact made can be supported by existing documents, produced contemporaneously with the event, if not already provided in the text.

NYSD.Comp.May2021
20-CV-10208

It is hoped that the Defendants will come to their senses, and speedily offer reasonable settlements, along with agreements to change their policies and practices. The alternative will force Plaintiff to submit detailed reports on each of them, showing their shameful and deceitful roles in the causeless harassment of a knowledgeable occupational therapist, and the resulting denial of mandated services for students, by their having weaponized investigations, for the purpose of silencing advocacy for students.

This case is primarily about Retaliation to Special Education Advocacy, and to Opposition to inappropriate and illicit supervisory directives and fraudulent standard operating procedures. Because it pertains to the practice of Occupational Therapy, which is a medical, science-based profession; professional ethics require consideration of the declared Medical Necessity of practicing in a Medicaid Compliant setting. The standards required for Medicaid and IDEA significantly overlap with the minimal professional standards for Occupational Therapy.

The Office of Related Services makes no serious effort to actually comply with these minimal professional standards, making it ethically untenable to cooperate if administratively confronted. This I also seen in the written records, and in the DOE ORC's SOPs, which directly conflict with established standards to maintain record integrity. Apparently, the Office of Related Services finds these minimal standards to be too high to even make a serious effort to comply. See Attachment A, *A State Complaint and A Therapist's Compliance Audit*, as well as the NYSED SEQA Investigation Reports.

In this case, both the advocacy, and the retaliation to it, have been almost entirely through written documents, making it simple to establish direct, linear causality. It is the Defendants' own writings, in the form of complaints to SCI and OSI, which directly prove their guilt. The Defendants have consistently taken protected advocacy documents, and presented them as wrong-doing, in complaints to SCI and OSI. At the same time, they have intentionally ignored Plaintiff's reminders of the well-known, Federal, State and Local prohibitions against their actions. Further retaliation manifest by giving no warnings, keeping their harmful actions secret, refusing to give explanations in advance, during, or afterwards. These secretive acts of retaliation have taken the form defamatory claims of investigations, which were not actually happening, but only sought; of blacklisting, and through these acts, depriving the plaintiff of employment and income; while simultaneously directly depriving students of IEP Mandated and Medically Necessary services.

There are major gaps in data. Despite diligently seeking personnel records in FOIL requests, from January 2019 through September 2020, many are missing. Those received have been redacted to the point of absurdity, protecting not children, but instead removing the names of administrators who were violating the anti-retaliation prohibitions. Those missing appear to be intentionally so, as they would be self-incriminating.

There is pervasive violation of FOIL law, such as the 20 day limit for providing documents has repeatedly been dragged out to 6 months, and those required plaintiff to continually seek their

release and take appeals. The NYSFOIL office has stated that when someone brings an appeal to them, of NYCDOE failures to provide FOIL requests, they almost always validate the complaint.

Further, information and reasons given for failures to provide directly contradict other documents. The result is that the seeking of one's own records, which should have been provided by right, in short time, contemporaneous with events; turned into an additional source of retaliatory harm. These denials of records constitute complicity with what seems to be a conspiracy to further the prohibited retaliation.

Due to the history of the defendants' refusal to reasonably cooperate with the release of documents, it is projected that this problem will require court ordered subpoenas.

**Example of Retaliation through FOIL Failure and Fraudulent Spoliation of Evidence**

May 30, 2019 to September 21, 2020

Responsive to repeat FOIL requests, on 5/30/2019, the FOIL unit released a barely legible print out of the "Existing OSI Case Search". It is missing a number of cases known to have been referred by SCI, as well as a blank row, which they refused to explain. It does not have the date received by OSI, nor the date initiated at SCI.

The list includes the following cases and their outcomes:

From **Existing OSI Case Search**          Received 5/30/2019

| Subject | OSI Received | OSI# | OSI Closed | Reason Closed |
|---|---|---|---|---|
| Complainant | August 2014? | **14- 08626  S** | 11/17/2014 | Investigative Refer |
| SY 2013 – 2014 | 6/23/2013 | **14- 06520  C** | 8/22/2014 | Investigative Refer |
| | | Psych Report Fraud, IDEA violations, Record tampering. | | |
| SY 2014 – 2015 | 2015, Jan. or Feb. | **15- 02200  C** | 3/19/2015 | Administrative Refer |

**Blacklisting via Ineligibility on Roster List**

Case 14-06520, from June, 2013, had sat at OSI, but re-activated, apparently in response to the Special Education State Complaints being made to NYSED SEQA. Principal Drysdale received notice from OSI on September 30, 2014, instructing her to investigate the allegations made by plaintiff on fraud in testing, records tampering, and other issues. She forwarded it to Plaintiff, with an email on October 1, 2014. It is believed that this is what caused the Ineligibility status across different practice settings, as seen in the Roster Details table received on 5/30/2019.

Plaintiff had never before seen any of this data, nor known why other problems were manifest.

In his second letter, dated 9/23/2019, Defendant Henry Bluestone Smith, Chief of Staff for the Office of General Counsel, again pushed ahead the retaliatory agenda. He attempted to explain why the Plaintiff lost eligibility on 9/30/2014, knowing that Defendant Baranello had withheld

3

the underlying documents pertaining to OSI 14-08826, starting in August, 2019; showing how it had actually been justified. Instead, he claimed it was due to a complaint of a vendor employer of Plaintiff. This, of course, is impossible, as a vendor has no power to directly remove eligibility status. Both of Smith's letters parroted the incorrect statements of prior instances of retaliatory charades, including incorrectly stating that a request to SCI for the process of restoring an incorrectly removed clearance, was actually a formal complaint, and which was after the alleged retaliatory act. The real complaints, with substantive data to support, were received and quickly buried in mid March, along with a copy of the State Complaint and Therapist's Audit Report.

While Smith failed to give a name for the allegedly powerful vendor, the only one timely available is DRJK, LLC, under Related Services Contractor. In fact, that appears to be the only eligibility status left open as of 10/1/2014; and "newly" Ineligible" as of 6/22/2018.

However, Rubin's first contact with DRJK, LLC, was on 9/30/2014, when she responded to a notice seeking therapists, on a local list serve, at 11:06 AM. Over the following week the vendor repeatedly stated that he had caseloads at various NYC schools, offered them, but then placed barriers to Rubin's moving ahead in the process. It turned out that, without Rubin's permission, he had entered her name and information into his vendor data base of available therapists, in an effort to obtain schools in which to place therapists. This is a major problem created by the Vendor Provider Cascade system - it results in Bait and Switch nonexistent job offers, instead of direct linkages for available therapists to actually provide services.

A FOIL request was made on August 21, 2019, #F16,326, seeking complete records on 12 known OSI complaints, in 7 of which Plaintiff was the "subject", and 5 of which the Plaintiff was the "complainant". Nothing was provided until a release on December 2, 2019, 4 months late. In the intervening months, Plaintiff had to repeatedly appeal the constructive denial of documents. What was provided was missing entire cases, and only SCI or OSI documents, and were all severely redacted.

Defendant Smith's first letter supporting the group retaliation was dated June 27, 2019, claimed that the FOIL requests were all in compliance and up to date, citing 2 FOIL numbers. Rubin corrected him, giving him an additional FOIL request, which was already well past deadline, and other facts which undermined all the positions which he took.

As of December, 2019, Plaintiff was involved in EEOC petitioning, and could not also address the serious gaps in the documents. On August 31, 2020, a FOIL request and appeal was made, #F17,515, and denied, by Defendant Baranello. He wrote that they did not need to respond, as it was the "identical" request as before, which it was not; and too late to appeal. In fact, prior releases had required multiple FOIL requests. In fact, he cited numerous FOIL numbers, proving that the request was NOT the "identical" one. He absurdly cited FERPA as an excuse to not allow documents.

He verified the original letter from his subordinate, Dennis Doyle, who wrote:

OSI informed that it did not conduct investigations for case numbers 14- 08626, 14- 06520, and 15-02200. Records for these cases could not be located by OSI. Accordingly, there are no OSI records to release with respect to these case numbers.

However, the *Existing OSI Case Search* showed that all 3 were received, logged in, and substantively processed, i.e. "investigated". They were all given serious review, and had directives for further actions, either Investigative Refer or Administrative Refer. This also demonstrates the falseness of the repeating pattern, in the prior and future instances of personnel filing a complaint with SCI, and immediately claiming that, while SCI had not even screened it in or out; Plaintiff "was under investigation".

It appears that the complaint about which Rubin was never informed, in August to November, 2014, did, in fact, result in a blacklisting action, as Rubin's eligibility to provide services in most settings was removed, effective 9/30/2014, and she was officially on the "Ineligible" list, with never having been told how or why.

For months Rubin, and her students and parents, had to cope with the system refusing to process RSAs, and removing students from Rubin's case listing in SESIS. This directly caused the loss of many students, and thus income. The same blacklisting persisted into the future, resulting in Rubin repeatedly going to job interviews, which went well, and then awkward rejections. There are hundreds of pages of documentary proofs on these efforts to be employed, through 2020, but made impossible due to the DOE Blacklisting.

**When "Advocating for a Student" is actually allowed as an Investigative Complaint**

For over a year the mother had requested mediation. BOE personnel, up and down administrative management levels, had refused to respond to the requests and massive failures. IDEA requires that administrators respond to requests.

On 7/29/2014, Rubin had been directed to respond to a complaint from the prior year, but had not been given specific enough issues to be able to respond. The complaint included, literally, "advocating for a student." Rubin pointed out that it was a violation of ADA and the Rehab Act to make a complaint about "advocating for a student. Rubin submit documents from the AOTA, the American Occupational Therapy Association, which stated that advocacy is the highest level of professional development for occupational therapists. There were other items, empty and frivolous at best, such as being in a building when they said Rubin should not have been. But no place, date or time was given, making it impossible to respond. Rubin was not even given the date on which the complaint was made against her, nor other information needed to establish a retaliation timeline.

Rubin knew the complaint had been made against her by June 17, 2013, which had been well documented in a letter dated June 19, 2013, and sent out by Rubin to the Chancellor, the NYC DOE Compliance Director, Executive Director for the CSEs, the District CSE, and then to SCI and

NYSD.Comp.May2021
20-CV-10208

OSI and others. It was entitled, **Family Intimidation Must Stop**. The student's mother had received a threatening call from administrator. It read (excerpts):

From the date when I first insisted that Educational-Psychological and Occupational Therapy re-evaluations be done, my students and myself have been systematically targeted and harassed by a DOE supervisory Occupational Therapist.
I am asking that you order your personnel to Cease and Desist in the making of threats, harassment and intimidation, of my students, their parents and myself. Please let them know that harassing and retaliating against Whistleblowers is not allowed.
- Cut -

**History:**
A student I picked up in November, 2012, had not had the benefit of any evaluations for 6 years. In January, 2013, responsive to my giving notice that no re-evaluations had been done; he was subjected to a hatchet job occupational therapy re-evaluation, and then to precipitous summary denial of occupational therapy services, along with denial of his rights.
The school personnel involved, from City College Academy of the Arts [M293], the CFN personnel involved [CFN 521], and the New York City Schools Occupational Therapy Supervisor for District 6; have collectively violated a large portion of IDEA Part B, 20 USC Section 1414, in pursuing termination of services. In addition, the assigned school psychologists, housed in M218, falsified reports by claiming to have done a Stanford-Binet Intelligence Scales test when they had not.

**Recent Incident:**
Late Monday afternoon, June 17, 2013, I received a phone call from this student's mother. She was very upset as a result of a phone call she received from Cynthia Rodriguez, Special Education Coordinator for the City College CFNs. The call was especially upsetting, as over the past 4 months, Ms. Rodriguez has repeatedly refused to meet with the mother. Ms. Rodriguez had also refused to direct the personnel under her to act in accordance with the underlying laws. Ms. Rodriguez refused to respond to the mother's letters and requests, such as for an Independent Occupational Therapy Evaluation, and to correct the record, in accordance with FERPA and your Regulations. The report falsely claiming to have done a Stanford-Binet Intelligence Scales remains in the student record, while the evaluation has not been done.
Ms. Rodriguez grilled and interrogated the mother, demanding that she answer ludicrous questions, such as if the mother had authorized me to assist her in advocating for her son. She insisted that the only recourse the mother had was to request a hearing. This demand, to a family who cannot afford an attorney, while Ms. Rodriguez herself has refused to address the underlying problems, is a cruel slap in the face. The call had the effect of being intimidating, and was a direct retaliation for the mother's little attempts to assert her son's rights.
**In the course of the "talk", Ms. Rodriguez claimed that I am being "investigated". The only basis appears to be that I have, in fact, been attempting to assert the student's rights, in accordance with the student and his mother's wishes.** It seems that this illicit investigative activity is spearheaded by Amy Schrank, the District 6 Occupational Therapy Supervisor. …
The mother was made to realistically fear that I will suffer loss of employment as a result of advocating for her son. …She is correct, as Ms. Schrank has substantively interfered with my ability to hold onto a small caseload, and has even taken actions recently to ensure this effect. The mother should not have been made to fear for my well being as a result of helping her.

Please explain to your personnel that targeting an advocate and whistleblower, for investigation, is retaliation and prohibited. …
I continue to look forward to someone in the New York City Schools with whom we may directly resolve these problems.
…  No one was supplied to help.

This was the same administrator who refused to address any of the issues raised, and instead, on May 21, 2013, wrote to Rubin:

… If the parent feels there is a violation of FAPE, due process hearings are always available to her….

This is precisely why there are so many requests for hearings. Instead of having rational discussions, DOE personnel shut down communications.

There was another reason why Rubin knew she had been targeted with a secret investigation complaint: A Secret Blacklisting had also gone into effect. In 2013, the principal of the elementary school where Rubin worked with 4 students, and had been extremely helpful, spoke with Rubin. She said, very sadly, that she was sorry, but that Rubin could not return to the school the next year, because someone had told her that Rubin was "under investigation". However, SCI had not yet screened the complaint, and had not even sent it to OSI to address. SCI sent it to OSI on June 28, 2013, where it sat, ignored for a full year.

It was not until after December 2, 2019, when Rubin received FOIL documents requested repeatedly over the year, that Rubin saw some of what had transpired. A special education director for a network had forwarded, to SCI, Rubin's June 17, 2013 letter to her, complaining about specific incidents of wrong-doing by DOE employees, and causing harm to the student. This was obviously protected advocacy. She claimed that what Rubin wrote was an admission of wrong-doing, while ignoring that the school had violated much of IDEA, such as holding an IEP meeting without giving a team member, the treating occupational therapist, notice; of discontinuing a service - Occupational Therapy - with the treating therapist absent, which is forbidden.

They had used the Wold Sentence Copying Test, which relies on incorrectly lifted data from a **1918** research report, with conditions completely different from those in the Wold; for a determinative decision, i.e. as a ruse to drop services. This violated IDEA, NYSED law and the Chancellors Regulations. The Wold was and is prolifically used, per directives from ORS.

For an in-depth treatment of invalidity of the *Wold Sentence Copying Test,* see Attachment A, A State Complaint & A Therapist's Audit, Complaint Area VIII. Continual and Intentional Violation of 20 US Code Section 1414 (b)(2)(C) and Section 1414 (b)(3)(A)(iii) and (v) - By Promulgating the use of instruments which are not technically sound; of assessments used for purposes for which they are not valid or reliable; and use contrary to directives and instructions of the producer of such assessments, pages 19-20, with 10 pages of exhibits, including a copy of the table, from **1918**, from which Wold incorrectly lifted his data.

7

NYSD.Comp.May2021
20-CV-10208

Other instruments are directly misused, such as taking a questionnaire developed to engage children in planning their treatment, using it as part of a determinative assessment, and when the student described what he wanted to achieve in his therapy; they precipitously ended his occupational therapy.

The first illicit IEP meeting was held on December 12, 2012. At the illicit March 15, 2013 IEP meeting, the school had the parent sign an outdated form at the meeting, Prior Written Notice, which merely acknowledges that the school was planning to stop the service, (over her and her son's protests); and which form requires 30 days before the school is allowed to actually cut off the service, so that the parent can take action to stop it. She asked for mediation, among other things, which were all ignored.

Rubin had helped the mother write a letter to the school, dated April 10, 2013, including that she (the mother) and her son disagreed with taking away his OT. Because the OT evaluation results were so far from his actual performance, how the VMI was scored was questionable. The protocols were asked for.

There was no response at all to the letter. However, on a file review it was located, and an astoundingly disrespectful note was on it at the bottom:

*4-15-13*

*Mother was asked which protocols and VMI booklet was requested, she did not know which documents she needed and asked if I spoke with Ms. Rubin. She was reminded that she makes the decision for (her son).*

In an email from Christopher Dalton, then Director of Office of Special Investigations, dated August 29, 2014, he refused to let Rubin know of the dates of complaints made against her, but added:

*There are several issues that appear to have come to light on or about 4/15/2013.*

This shows a linear causal relationship, starting from Rubin assisting the mother to understand the test results and helping her to write a letter to the school, which is clearly protected advocacy; to making a complaint to SCI and OSI, using that letter as the basis for claiming wrongdoing.

On 7/31/2014, responsive to Rubin's complaint about the assigned investigator, Dalton wrote to Rubin:

*… I have given Ms. Baumann (the investigator), permission to inform you of the allegations that have been lodged….*

Given that this was in no way a criminal or even serious complaint, it is inconceivable that it required the direct intervention of the Director of the OSI for the "subject" to be told what the accusations were. And, while 4 items from OSI 13-05861 were described, all of them too trivial

NYSD.Comp.May2021
20-CV-10208

to have considered for a formal complaint; she failed to explain anything from 3 other complaints - OSI 14- 08626, and 2 others which were referenced in SCI documents, but not seen elsewhere.

On both 4/1/2019, and 9/22/2020, SCI has refused to release anything, including even a list of dates of complaints. This has made It impossible to establish actual start dates for complaints, and thus "retaliation". In this way, SCI itself is engaging in the retaliation against peronnel. At the same time, the documents actually released by BOE, in FOIL responses, alternated between omitting the SCI complaint entry information, and that from OSI which received it. These will require subpoenas for a full understanding of the retaliatory, harassing and harmful investigative complaints.

While the complaint to SCI / OSI was that Rubin went to the school when she should have not, they failed to state that Rubin had not known about the 3/15/2013 IEP meeting, nor about the school's illegally insisting that the removal of OT went into effect immediately. Rubin had correctly gone to the school on that day, an hour or so after the meeting, to see the student as scheduled. At that time, Rubin was told that they discontinued OT at the meeting, and that it was in effect immediately. Rubin was correctly at the school, but the school had massively violated IDEA.

Rubin learned this from the ninth grade student himself, who was visibly upset about it, and who wanted to know if anything could be done about it. Rubin asked him if he wanted to go to the principal and ask for her to help him on the unfair meeting. He did. Rubin and the student went to the principal's office - Dr. Drysdale - to talk with her about it. It turns out that she was preparing to go on vacation early that day, and she angrily said she did not have time to talk with him. She said she would talk with him when she returned, but never did.