Rubin v. NYCBOE et al
20-CV-10208    12/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

LISE RUBIN,                                                    **20-CV-10208**
                                    Plaintiff,

        Against -                                             **December, 2021**

NEW YORK CITY BOARD OF EDUCATION, et al. a.k.a.:    **SECOND AMENDED**
NEW YORK CITY BOARD OF EDUCATION, NEW YORK
CITY SPECIAL COMMISSION OF INVESTIGATION,            **COMPLAINT**
ANASTASIA COLEMAN, DANIEL SCHLACHET, HENRY
BLUESTONE SMITH, JOSEPH A. BARANELLO, JULIA         **PART I.**
BUSETTI, ILENE LEES, KATHERINE G. RODI, MICHAEL
VAN BIEMA, SUSAN EPSTEIN, ALEXIS LANTZOUNIS,        Lines 1 to 391
KATHERINE WITZKE, GERALDINE A. CULLEN
                                    Defendants        Pages 1 to 40
------------------------------------------------------------------------

**SECOND AMENDED COMPLAINT**
**DECEMBER, 2021**

**PART I. Lines 1 – 391        Pages 1 - 40**
**CONTENT:**
Section 1.PARTIES (Initial listing)
Section 2.Service
Section 3.Dates of Defendants' Defaults
Section 4. PARTIES - Plaintiff description
Section 5. Related Services Agreements (RSA's) Prove Employee Misclassification
Section 6. Venue, Jurisdiction
Section 7. Preliminary Statement on Statutory Basis of Suit
Section 8. RELIEF SOUGHT
Section 9. Administrative Procedures – Predicate Actions – Notice Requirements;
        - *Notice of Claims* Scam - Request for Judicial Notice
Section 10. Statutory Time Limitations, Equitable Time Tolling & Underlying Facts
Section 11. Employee Misclassification Fiasco & the Economic Realities Test
Index of Attachments to Part I. & Attachments

**Section 1. PARTIES** (Initial Listing)
**AGENCY / GOVERNMENTAL DEFENDANTS (2):**

**DEFENDANTS:**
1.  New York City Board of Education "BOE' or DOE";

2.  New York City Special Commission of Investigation "SCI"

**DEFENDANTS, COLLECTIVELY; AND**
**INDIVIDUALLY IN THEIR INDVIDUAL CAPACITIES (12):**
**Individual Defendants at NYC Special Commissioner of Investigation (2):**

Rubin v. NYCBOE et al
20-CV-10208    12/2021

3.  1.Anastasia Coleman, Commissioner of SCI; 2.Daniel Schlachet, First Deputy Commissioner of SCI

**Individual Defendants at New York City Board of Education (10):**

4.  1.Henry Bluestone Smith, Chief of Staff, Office of General Counsel. 2.Joseph A. Baranello, Deputy Counsel & Chief Privacy Officer. 3. Julia Busetti, Agency Attorney. 4. Ilene Lees, Director, Office of Special Investigations (OSI). 5. Katherine G. Rodi, Esq., Executive Director, Office of Employee Relations. 6. Michael van Biema, Executive Director, Office of Related Services (ORS). 7. Susan Epstein, Director of Compliance and Contracts, Office of Related Services (ORS). 8. Alexis Lantzounis, Supervisor of Occupational Therapy, Manhattan District 3. 9. Katherine Witzke, Principal, Public Elementary School M009, Sarah Anderson School. 10. Geraldine A. Cullen, Second Grade Teacher, P.S. M 009, Sarah Anderson School.

5.  **Plaintiff** LISE RUBIN, brings this action against the named Defendants, and based on factual knowledge and hard evidence, alleges as follows:

**Section 2. Service**
**SERVICE OF SUMMONS AND COMPLAINT:**

6.  The U.S. Marshall's Office was not utilized in providing service.

7.  The NYC Law Department, representing the NYC BOE; asked for electronic service, which was provided repeatedly on June 3 and 4, 2019.

8.  All other defendants, both institutional and individual, were provided personal service to their usual place of work, on June 3, or June 4, 2019. They were also served by USPS Priority Mail, and tracked for delivery. They were also served again, by US Mail, per an Order of the Court later in June.

9.  As Defense Counsel refused to communicate with Plaintiff as to the status of the individual defendants, as to if they were or were not represented by him; and he also refused to agree to provide them service in any interim period during which he had not decided if he would represent them; Rubin was forced to continue to provide them service, by U.S. Mail, for many weeks.

10. During that period, attempt was made to locate home addresses, to be more certain of timely receipt, but not all were located.

**3. Dates of Defendants' Defaults**
**Certificates of Default Issued on Individual Defendants, by Clerk of Court,**
**U.S. District Court, Southern District, August, 2021**

11. The Individual Defendants were Certified in Default in August, 2021.

Defendant          Docket #      Date

Rubin v. NYCBOE et al
20-CV-10208    12/2021

| | | |
|---|---|---|
| Witzke | 71 | 8/13/2021 |
| Schlachet | 92 | 8/16/2021 |
| Coleman | 93 | 8/16/2021 |
| Smith | 94 | 8/16/2021 |
| Busetti | 95 | 8/16/2021 |
| Baranello | 96 | 8/16/2021 |
| Rodi | 107 | 8/23/2021 |
| Cullen | 108 | 8/23/2021 |
| Van Biema | 109 | 8/23/2021 |
| Epstein | 110 | 8/23/2021 |
| Lees | 111 | 8/23/2021 |

### Section 4. PARTIES: Plaintiff Description
### THE PARTIES; PLAINTIFF, Lise Rubin
(Information on Defendants is provided later.)

12. **Plaintiff Lise Rubin** ("Plaintiff" or "Rubin") is a resident of Bergen County, New Jersey; and previously resided in New York County, New York. Her employer has been the NYCBOE, for all applicable times concerning this case; through the RSA service delivery system; at various locations in Manhattan and the Bronx, at public, private and religious schools, from 2012 through 2018.

13. Rubin is a professional occupational therapist, school psychologist and special educator, with over 45 years of professional experience, including teaching university masters' degree courses in occupational therapy and special education, as well as providing field work supervision for both professions.

14. Rubin has been an accomplished innovator in higher education and in professional Manpower Training projects. In curriculum development in higher education, in both occupational therapy and special education, Rubin specialized in developing competency-based training and supervisory models; which was implemented at the Special Education Masters Degree program at the University of Massachusetts in the Boston, Massachusetts campus.

15. Rubin implemented these methods in her leadership in two Manpower Training Projects, one the development of a new Occupational Therapy program at Quinnipiac College in Worcester, Massachusetts; on her initiative, to develop and speedily enlarge the workforce capacity for occupational therapists in the state schools, and, to assist in deinstitutionalization, in educational and community settings, by developing a Fast Track for experienced COTAs (certified

Rubin v. NYCBOE et al
20-CV-10208    12/2021

occupational therapy assistants) to become fully licensed therapists. Another one was based at a Special Education Collaborative, hiring and training teachers and other professionals to specialize in moderate to severe developmental disabilities.

16. At Boston University, Plaintiff completed advanced doctoral level studies in test design and validation.

17. Starting in 2012, and at all relevant times, Rubin was employed by NYCDOE as her sole employer, as a professional occupational therapist; despite NYCBOE having intentionally Misclassified her employment status, therein causing loss of protections, benefits and retirement contributions; the loss of paid sick time and health insurance; decreased and unpaid social security benefits; and having continuously waged a campaign of harassment, hostile workplace, and making false accusations to SCI and OSI.

18. It is astounding that they selected to follow this course of action, instead of allowing Rubin to actually help them to solve the pressing systemic and institutional problems, such as failure to locate, hire and supervise occupational therapists, and many others; which they have proved themselves to be incompetent to achieve.

### Part 5. Related Services Agreements (RSA's) Prove Employee Misclassification
### EMPLOYEE MISCLASSIFICATION IS PROVEN BY THE RSA'S TERMS:
### RELATED SERVICES AGREEMENTS REQUIREMENTS ARE
### IDENTICAL TO THOSE OF THE ECONOMIC REALITY TEST

19. Regardless of the dates of various changes in laws as to coverage of "independent contractors"; Plaintiff was and is an employee.

20. As of October 18, 2018; the NYCHRL definition is precisely and specifically equivalent to the legal requirements to use an RSA (Related Services Agreement). [Attachment #1, RSA-A Form Related Service Agreement, or RSA, page 1]

21. NYCHRL, as amended on January 18, 2018, Local Law #63, effective October 18, 2018, states:

22. **The New York City Administrative Code, Title 8: Civil Rights**
    **8-102 Definitions. Employer.** … For purposes of this definition, natural **persons employed as independent contractors** to carry out work in furtherance of an employer's business enterprise ***who are not themselves employers*** shall be counted as persons in the employ of such employer.

23. This reflects the Economic Realty Test analysis, which predates all the recent amendments of NYCHRL and NYSHRL, as well as this case's timelines.

24. On page one of the RSA, it states:

*25. RSA TERMS 1 THROUGH 6: APPLICABLE TO PARENT, PROVIDER,..:*

Rubin v. NYCBOE et al
20-CV-10208    12/2021

*2. The DOE will pay only for the provision **of direct service by the Provider identified** in Section III of this form. **Service cannot be provided by any other individual.***

26. The RSA itself will not allow the RSA to be used by an overseeing "employer"; it must be used by the individual and professionally licensed provider, and their name listed; … **who shall be counted as persons in the employ of such employer**. – that "**employer**" being, in the case of an **RSA, NYCBOE**; and which is to say, the provider is thereby an employee of the NYCBOE.

27. **BECAUSE** of the RSA. Rubin is an employee of NYCBOE **BECAUSE** Rubin worked under RSAs.

28. Therefore, therapists hired and working under RSAs are to be assumed to be Misclassified Employees; and not Independent Contractors, as Defendants claim; and this embodies the actual reality of the behavior of the NYCBOE.

29. Therefore, all actions Defendants have taken against Plaintiff, on or after October 18, 2018; are directly subject to the NYCHRL, and to the individual liability of the individual defendants.

30. However, those before that date of amendment are also validated as Employee Misclassification, using the same Economic Realty Test as has been applied to the NYCHRL. There is further content on the topic of Worker Misclassification.

### Section 6. Venue, Jurisdiction
### JURISDICTION AND VENUE

31. **Jurisdiction:** This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Federal Question Jurisdiction; in that this is a civil action arising under Title VII; under 29 USC Section 794a; under 42 USC Section 12203 (ADAAA), Title V; under The Rehabilitation Act; and other applicable laws and statutes. This court has supplemental jurisdiction over plaintiff's related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a).

32. **Venue:** Venue is proper pursuant to 29 USC Section 1391 because a substantial part of the events or omissions giving rise to this cause of action, including unlawful employment practices alleged herein, occurred in this district.

33. The discriminatory and retaliatory acts occurred, as a continuous harassment; over the years 2012 through at least 2020. If one includes the retaliatory Religious Discrimination harassment perpetrated by NYC Law Department attorney Ryan Nasim, on behalf of Defendants, it extended through September, 2021.

### Section 7. Preliminary Statement on Statutory Basis of Suit
### PRELIMINARY STATEMENT – STATUTORY BASIS OF CASE
### Initial Overview of Issues to be Raised

Rubin v. NYCBOE et al
20-CV-10208    12/2021

34. This Action at Court has been brought responsive to the institutional, and both the collective and individual Defendants', lawless, willful, reckless, violations of the prohibitions against Retaliation & Interference;

35. -To redress NYCBOE's systemic Retaliation against Opposition to, and advocacy against, NYCBOE's pervasive substandard occupational therapy and special education services, reflected in rampant illegal violations of IDEA, depriving students of their FAPE (Free Appropriate Public Education) Rights.

36. - Plaintiff Rubin's open statements in opposition to NYCBOE providing students, across the city & boroughs; with a grossly, substandard, mediocre, and inadequate education; whereas Rubin demands that all providers across all grades, subjects and locations, have a duty to strive for personal professional excellence to serve the educational betterment of the students, and has knowledge and experience to attest that, using proper supervisory methodology, this is possible to achieve;

37. -To redress NYCBOE's pervasive Misclassification of professional workers, causing grossly substandard working conditions, including causing personnel to intentionally defraud students; by continual demands to Suffer to Work, uncompensated; and lawless harassment of and continual retaliations against, Plaintiff Rubin's Objections to the above violations of law and common standards of professional practice;

38. - Including Defendants' barbaric **Prima Facie retaliation** incident, on **June 22, 2018,** an organized and concerted attack on Rubin for providing parents with information to obtain services and RSAs for their children, the *Letter to Parents*, June 21, 2018 [Attachment #2 *A Letter to Parents*], a clearly Protected Activity; with Defendants pretending it to be illegal to so assist parents; by their summarily and causelessly removing Rubin's security clearance, secretly removing Rubin from various rosters and eligibility lists, for "problem coding", directly due to Rubin refusing to do anything wrong; and whereas Rubin had repeatedly submit hard evidence on actual wrong doing by the Office of Related Services personnel and leadership; which SCI and OSI repeatedly buried, showing institutionalized Disparate Treatment;

39. – And when, in August, 2018, OSI found that Rubin had in fact done no wrong; Defendants violated their own SOPS and failed to reverse their causeless actions;

40. – And where Defendants retaliated further through first refusing to allow Rubin any knowledge whatsoever about the pretense of the harmful actions; they later also stonewalled and weaponized FOIL request responses into further Prima Facie retaliation; to keep their unconscionable actions

Rubin v. NYCBOE et al
20-CV-10208   12/2021

covered up;

41. – And to Defendants' prolonged **Prima Facie Retaliation**, starting **in March, 2019,** against Rubin for filing a ***State Special Education Complaint***;

42. - And which Retaliation failed to stop even when receiving the April 9, 2019 Notice from NYSED SEQA [Attachment #3 NYSED SEQA Notice of Investigation, April 9, 2019], that they were starting an investigation pursuant to Rubin's Complaint;

43. - And which complaint of Rubin to NYSED SEQA was validated by the NYSED SEQA report which issued on May 17, 2019 [Attachment #4 NYSED SEQA Investigation Report and Corrective Action Plans, May 17, 2019], and yet still the harassment continued and escalated.

44. - Adding to the Defendants' growing list of violations of laws, retaliation against bona fide Whistleblowing.

45. - To redress the Defendants' unconscionable use of secret blacklisting, and other abusive attacks on student, parental and employee rights; and

46. Which case herein is brought in the Public Interest and for the Common Good, as the Defendants' have been, and continue to, ruthlessly attack parents and personnel who advocate for students and children; with and without special education needs; and a LIMIT to their gross and harmful misconduct must be set.

## STATUTORY BASIS:

47. The laws under which this suit is brought include:

48. **-Title VII of the Civil Rights Act of 1964, Section 2000e et seq.;** -For Defendants' Retaliatory Employment Discrimination in Violation of Title VII of the Civil Rights Act of 1964; Responsive to Rubin's engaging in protected activities; and Defendants intentionally violated Rubin's rights under Title VII, with malice and willful, reckless indifference, unlawful, intentional, coordinated acts of violations of prohibitions against Discriminatory Employment Retaliation, Coercion, Intimidation and Interference, pursuant to **Title VII of the Civil Rights Act of 1964, Section 2000e et seq.;** and

49. **The ADAAA & The Rehabilitation Act:** – For Defendants' their willful, reckless, unlawful, malicious Discriminatory Employment Retaliation, in retaliation against Rubin because she has opposed acts and practices, for which Notice had repeatedly been given; made unlawful under ADAAA & the Rehab Act; in violation of Federal Laws to include: The Rehabilitation Act of 1973 ("The Rehabilitation Act"), Section 504, and 505(a)(2) remedies;; and the Americans with Disabilities Act ("ADAAA"), Titles II and V., Section 12203; including Retaliatory Harassment,

Rubin v. NYCBOE et al
20-CV-10208    12/2021

that their conduct would deter protected activity by therapists and other personnel in NYC Schools; Disparate Treatment, Retaliatory Creation of a Severe and Pervasive Hostile Work Environment, Constructive Discharge; Wrongful Termination; and

50. **- For the Defendants chronic violations of The Fair Labor Standards Act, or FLSA** – For Defrauding Plaintiff and most other "Independent Providers" of established Worker Rights, including the right to join a Union and to benefit from, and be protected to, filing grievances and arbitration, from which Rubin was and is, in fact, eligible to benefit.

51. – From Employee Misclassification, thus directly Obstructing Rubin from joining the Union; failure to pay benefits due, including retirement, sick paid time, professional education compensation, paid vacations, obstructing eligibility for FMLA; continual coercion to Suffer to Work without compensation; Failure to compensate for work time off premises, which frequently was for an entire work day, and also on Sundays, and evenings; and which is documented; which was forced due to defendants refusal to provide not merely a computer workstation, but even refused to provide an electrical outlet, despite needing it for essential duties such as student instruction in keyboarding, and entry of legally and professionally required documentation into SESIS; which constitutes as grossly substandard working conditions.

52. - For failure to compensate for documentation, report writing, phone calls, done off site.

53. - For failure to provide any salary or any means of regular income, and instead obstructing it, for failure to provide payment, or a means of billing, for thousands of hours of labor, for retaliating against Rubin for refusing or attempting to refuse to work without compensation;

54. - For coercing the performance of uncompensated work during work hours on site, therein directly depriving Rubin's students of mandated services, and directly causing Rubin a loss of income.

55. - For refusing to release the logs of use and access to SESIS, preventing an accurate accounting for time spent in documentation and tasks in SESIS; and for which other employees have been compensated.

56. **The New York State Human Rights Law, NYSHRL:** - For the Defendants' Discriminatory Employment Retaliation, Coercion, Intimidation and Interference; of their lawlessly Aiding and Abetting Discrimination, Retaliation, and Interference; Disparate Treatment, Retaliatory Creation of a Severe and Pervasive Hostile Work Environment, Constructive Discharge; Wrongful Termination, wrongful removal of, and wrongful failure to reinstate Security Clearance; Rosters, Eligibility, Wrongful use of Problem Coding;

Rubin v. NYCBOE et al
20-CV-10208    12/2021

57. These wrongful and illegal actions being violations of the NYSHRL; which is in many way similar to the NYCHRL; and which is of value to copy out here:

58. – These wrongful actions pertaining to the **New York State Human Rights Law, N.Y. Executive Law §§ 290 et seq. ("NYSHRL"),** and specifically for violating Section 296. 1(a), (e ), 6, 7, 13; and even Section 296-d; and to which the individual defendants are also individually liable; and specifically pursuant to:

59. **Section 290. Purposes of article. 3., which cites the duty to not provide an inadequate education;**

60. **Section 291. Equality of opportunity is a civil right. Subsection 2. The opportunity to obtain education...** is hereby recognized as and declared to be a civil right.

61. **Section 296. Unlawful discriminatory practices.**

62. 1. It shall be an unlawful discriminatory practice:

    **1.(a) For an employer or licensing agency**... to bar or discharge from employment .. or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

    **1.(e) For any employer,... to** discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

    **1.(h) For an employer, licensing agency,**... *or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in any proceeding under this article, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims.* Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories.

63. **6. Aiding, abetting, compel, or coerce...** It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.

64. **7. Prohibition against Retaliation:** It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

65. **13. Blacklisting Prohibited:** It shall be an unlawful discriminatory practice... (i) for any person to boycott or blacklist,...

66. **§ 296-d. Unlawful discriminatory practices relating to non-employees.** It shall be an unlawful discriminatory practice for an employer to permit unlawful discrimination against non-NYSHRL employees in its workplace. An employer may be held liable to a non-employee who is a contractor, subcontractor, vendor, consultant or other person providing services pursuant to a contract in the workplace or who is an employee of such contractor, subcontractor, vendor, consultant or other person providing services pursuant to a contract in the workplace, with respect to an unlawful discriminatory practice, when the employer, its agents or supervisors knew or should have known that such non-employee was subjected to an unlawful discriminatory practice in the employer's workplace, and the employer failed to take immediate and appropriate corrective action. In reviewing such cases involving non-employees, the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of the person who engaged in the unlawful discriminatory practice shall be considered.

67. The Defendants, each of whom had a direct hand in the attacks on Rubin's civil rights; and each of

Rubin v. NYCBOE et al
20-CV-10208   12/2021

whom could have individually prevented, stopped or reversed, the cruel retaliations; and each of whom could have individually prevented, stopped or reversed; the loss of security clearance, the loss of eligibility, the false Problem Coding; all of which constitutes as an illicit denial of rights to licensure to work in NYCBOE, and as Blacklisting; under NYSHRL Section 296, 1(a), (e), 6, 7, & 13.

68. Each of the Defendants had the power to prevent, or rectify, the loss of employment and loss of income; They are each and every one liable.

69. Taking harmful actions, instead of respectfully holding themselves and each other to promoting the Civil Right to an adequate Education; Instead, they collectively and individually attack anyone, including Plaintiff Rubin; who has, without directives or court orders; taken direct action to effect this Civil Right, to ensure that NYC's children do, in fact, obtain an above adequate education; which is the duty of the defendants who have failed en masse.

70. **And as The NYSHRL NYEL, Article 15, Section 297(9)** allows bringing a claim for Human Rights Violation under the NYSHRL in a court.

71. **– The NYS Labor Laws 740-741 – The Health Care Worker Whistleblower Act – For the Defendants'** willful, reckless, unlawful, malicious violations of New York State Labor Laws §§ 215, 740, and **741** - Unlawfully terminated Plaintiff's employment, in violation of *Labor Law* §§ 215, 740, and *741*, Health Care Provider Whistleblower Protection Act, which specifically applies to health care providers in schools; in retaliation to Rubin's complaints.

72. **New York State CCL 75-b,** Civil Service Law Section 75-b, which prohibits adverse action against any employee who discloses to a governmental body information: that concerns a violation of law creating a substantial and specific danger to public health or safety, (and/or) that the employee reasonably believes is true and constitutes an improper governmental action because it is believed to violate a law, rule or regulation.

73. A Notice of Claim is not required. It specifically includes school employees.

74. **N.Y. Labor Law Sections 650 to 665; Minimum Wage Act** – for failure to compensate Rubin for labor, and Suffering to work; Failure to pay overtime,

75. **The New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 et seq. ("NYCHRL");** And to which violations of NYCHRL, the individual defendants are liable individually, in their individual capacities, as all the individual defendants had a direct hand in the abuse and

76. **Each Individual Defendant**, was, each and every one, able to prevent or stop the abuse; and

Rubin v. NYCBOE et al
20-CV-10208    12/2021

77. - Their having been warned of the lawless nature of their behavior;

78. **-** While they created false, defamatory writings to cover up their own wrongful behavior and cause further harm;

79. **- And** that their harmful actions caused: Discriminatory Employment Retaliation, Coercion, Intimidation and Interference; of their lawlessly Aiding and Abetting Discrimination, Retaliation, and Interference; Disparate Treatment, Retaliatory Creation of a Severe and Pervasive Hostile Work Environment, Constructive Discharge; Wrongful Termination; denial of, wrongful removal of, and wrongful failure to reinstate Security Clearance; Rosters, Eligibility, Wrongful use of Problem Coding.

80. And specifically pursuant to: **The New York City Administrative Code, Title 8: Civil Rights:**

81. **8-102 Definitions. Employer.** … For purposes of this definition, natural persons employed as independent contractors to carry out work in furtherance of an employer's business enterprise **who are not themselves employers shall be counted as persons in the employ of such employer.**

82. **§ 8-107. Unlawful discriminatory practices.**
    1. Employment. It shall be an unlawful discriminatory practice:    6. Aiding and abetting.
    7. Retaliation.    9. Licenses, registrations and permits.
    13. Employer liability for discriminatory conduct by employee, agent or independent contractor.
    19. Interference with protected rights.

83. **Failure to Pay Social Security and Retirement Benefits:**

84. Plaintiffs Failed to pay into Retirement benefits; Failure to pay into Social Security Fund; By repeated loss of work and pay, causation of decreased social security benefits rate; by failure to allow employment and work, forced starting of Social Security Benefits, causing a decrease of her lifetime benefits.

85. **Failure to pay for sick time.**

86. For repeatedly, continuously and causelessly; malicious and destructive acts of Defamation, Slander and Libel;

87. – And that each one intentionally, individually and directly deprived Rubin of the license to work in NYCBOE; that they each participated in the causeless and illegal retaliation; each of whom could have individually prevented or stopped it; each Interfered with Rubin's protected rights.

88. **And Therefore, the Results are: At all times, each and every action against Plaintiff Rubin; While done as a chain of events, in which each Defendants was a link; Could at all times have been prevented or stopped individually; and that Defendant actions have been the direct result, at all times, <u>not of Rubin's wrong doing or misconduct; but instead of Rubin being exemplary, or Rubin doing good, not bad; While Defendants maliciously &</u>**

Rubin v. NYCBOE et al
20-CV-10208    12/2021

**mercilessly attacked Rubin; and specifically for Rubin doing Good.**

### Section 8: Relief Sought
### RELIEF SOUGHT:

89. **Plaintiff seeks Relief, to include,** as specified further in this Complaint: declaratory, compensatory, back pay, front pay, injunctive, punitive and monetary relief; plus interest; to redress Defendants' unlawful employment practices, including unlawful discriminatory employment retaliation against Plaintiff.

90. **And due to Defendants severe Bad Faith, and to serve the Public Interest; to have them be punished;** warranting payment of Punitive Damages to Plaintiff, including Back Pay, Front Pay, Compensatory and Punitive Damages; and interest.

91. **For a net sum of: Monetary Damages: $1,500.000.00**

### Section 9. Administrative Procedures, Predicate Actions, Notice Requirements;
### *Notice of Claims* Scam & Request for Judicial Notice
### ADMINISTRATIVE PROCEDURES – NOTICE REQUIREMENTS

92. The initial Complaint to the EEOC was submit by the EEOC to the NYSHRC, as Standard Procedure, fulfilling any Notice of Claim questions.

93. The Complaint filed in this Court was served on the New York City Law Department, using the email address as directed; and to the NYCCHR, using process as directed. Any and all other prerequisites to the filing of this suit have been met. The jurisdictional prerequisites to commencing this action have been satisfied.

### REQUEST FOR JUDICIAL NOTICE: REQUEST FOR STATEMENT OF LAW
### ON *NOTICE OF CLAIM*

94. The NYCBOE, BY THE HAND OF THE NYC LAW DEPT.; IS INTENTIONALLY MISLEADING AND MISREPRESENTING TO THE PUBLIC AND TO THE U.S. DISTRICT COURT, SOUTHERN DISTRICT; THAT A ***NOTICE OF CLAIM*** IS REQUIRED TO SUSTAIN CLAIMS UNDER THE NYCHRL AND THE NYSHRL; WHEREAS IT IS NOT.

95. As such, bringing such a claim as the basis to defeat a party's entire case; and often pro se; is a gross injustice, and constitutes as a violation of FRCP Rule 11, which prohibits known false representations to the Court.

96. Attorneys from the NYC Law Department, representing the NYCBOE; have been continuously

Rubin v. NYCBOE et al
20-CV-10208    12/2021

filing Motions to Dismiss complaints, using as a primary basis a failure to file a Notice of Claim; which is not required under Civil Rights statutes.

97. It is specifically not required under NYSHRL and NYCHRL.

98. This scam was tried to be foist on this Plaintiff by the prior NYC Law Dept. attorney, Mr. Nasim.

99. This challenge generated anxiety, and caused Plaintiff to expend more than a dozen hours, at different times, seeking the truth of the matter. The latest time expenditure is directly related to a delay in production of this Amended Complaint, until research could establish this factual knowledge.

100.　　It is not easy to find; and not in the US District Court, Southern District.

101.　　Instead, one month ago, a Pro Se party had a case dismissed, due to this scam:

102.　　Ochoa v. NYC Department of Education, Docket 1:20 – CV – 09014, was dismissed on November 22, 2021; falsely based on the lack of filing a Notice of Claim. The plaintiff was not even given an opportunity to file one late, although it was not even needed.

103.　　Despite what the NYC Law Department convinced a US District Court judge; No Notice of Claim is required, as it is Inapplicable in Civil Rights Actions pertaining to municipalities, which is to say New York City and its departments and agencies:

104.　　***Notice of Claim* Requirement is Inapplicable in Civil Rights Actions.**

*The New York notice of claim requirement does not apply to an action against a New York public corporation asserting a claim under the Civil Rights Act of 1983, whether brought in a state court or in a federal court, because such requirement is regarded as inconsistent with the objective of federal civil rights law, as well as with principles of federalism and the Supremacy Clause of the United States Constitution. This principle has been extended to claims under other federal civil rights statutes, such as the Equal Pay Act5 and Title VII of the Civil Rights Act of 1964. Indeed, the notice of claim requirement has been held inapplicable to a claim against a public corporation alleging state civil rights violations, such as a claim for discriminatory practices under the New York Human Rights Law, although there are holdings to the contrary.*

105.　　From: 62A N.Y. Jur. 2d Government Tort Liability § 392, New York Jurisprudence, Second Edition | November 2021 Update. Government Tort Liability.

106.　　Further, in regards the NYSHRL and the NYCHRL, no ***Notice of Claim*** need be filed, as neither the NYSHRL, nor the NYCHRL, are tort actions:

107.　　*Whereas Education Law 3813 (2) dictates that no action "where the alleged tort" was committed by any teacher or member of administrative staff may be commenced "unless a notice of claim shall have been made and served," **an action brought under the State or City HRL is not a "tort" claim within the meaning of the statute**[.] … Thus, the branch of the defendants' motion for summary judgment dismissing the amended complaint for failure to serve*

Rubin v. NYCBOE et al
20-CV-10208    12/2021

*a notice of claim is denied as to the plaintiff's disability discrimination and retaliation claims…*

108.    From: DeMarzo v Urban Dove, Inc. 2017 NY Slip Op 32612(U) November 21, 2017 Supreme Court, Kings County Docket Number: 500466/13 Judge: Larry D. Martin.

109.    DeMarzo v Urban Dove, was a NY State Court decision. However, it failed to explain why it held some parts to a Notice of Claim failure.

110.    Over the past few months, there have been additional U.S. District Court, Southern District of New York cases, citing a fictitious *Notice of Claims* failure, and incorrectly supporting Rule 12 dismissals, at the US District Court, including: AYLEEN JAMES, Plaintiff, v. BOROUGH OF MANHATTAN COMMUNITY COLLEGE, et al 20-cv-10565 (LJL) | Filed 11/29/2021 2021 WL 5567848.

### Section 10. Statutory Time Limitations, Equitable Time Tolling & Underlying Facts

### STATUTORY TIME LIMITATIONS –
### EQUITABLE TIME TOLLING, & UNDERLYING FACTS

111.    **Timelines: Equal Employment Opportunity Commission - EEOC Filing Date(s) -** Under ADAAA, Titles II and V, and The Rehab Act; it is not required to file with the EEOC, nor does the 300 day to file with EEOC limitation apply.

112.    **Notice of Claims**: There is no need to file a *Notice of Claim* under ADAAA Titles II and V, nor the Rehabilitation Act. In fact, there is no predicate prerequisite of filing with EEOC, or to exhaust administrative remedies; prior to filing a Federal law suit on ADAAA Title II & Title V, and The Rehab Act.

113.    While time tolls / tolled starting with the filing of the EEOC case; it should be noted that the EEOC itself caused a day of eight months (8) months, and covering the Pandemic Court closure dates; whereas EEOC, had it acted timely, could have issued the *Right to Sue* Letter in January, 2020, before the Pandemic and court closures.

114.    Plaintiff completed the EEOC on-line screening on 8/1/2019; the Intake Online Charge Form on 9/25/2019; and the formal Intake Interview, remote, on **9/26/2019**; which was the official case opening and complaint filing date. Due to EEOC administrative problems, such as failing to read the on-line data of the case; the initial intake interview was not noticed by the NYC EEOC.

115.    The Plaintiff hand delivered the Complaint, in person, at the NYC EEOC offices on **10/31/2019;** finalizing the EEOC filing.

116.    On April 5, 2020, the NYC EEOC office submit a revised complaint, Final Formal Charges, to NYCBOE; by which time the COVID epidemic and the resulting lock downs

Rubin v. NYCBOE et al
20-CV-10208    12/2021

and court closures were in full effect.

117. Plaintiff was issued a **Right to Sue** letter on **September 5, 2020**. Approximately six months of this were due to COVID and court closures.

118. **EEOC's Eight (8) month Delay:** EEOC could have issued the Right to Sue letter on or around January 1, 2020, due to lack of jurisdiction on ADA Title II & Title V; instead the EEOC delayed the matter by eight (8) months.

119. The EEOC determined that this matter came to them under ADAAA, Titles II and V.

120. According to the New York City EEOC Office's interpretation of their empowering regulations; The EEOC policy limits their jurisdiction, and prevents the EEOC from taking action on Title II employment cases, regardless of merits. They state that the EEOC does not enforce Title II and V. cases, and, therefore, based on their established policy; refused to take any serious supports or investigatory actions whatsoever.

121. EEOC repeatedly had technology failures (additional) which interfered with their investigator assisting; and made it impossible to send Charges to NYCBOE until April, 2020.

122. The only good thing about this delay was that Rubin got to see the foolish and revolting lies that the NYCBOE would use in defending its undefendable, shameful and illegal misconduct.

123. By then the Epidemic was in full swing; forcing court closures.

124. **October 31, 2019: EEOC says: Go to OCR; Fails to directly refer; Wastes 8 months.**

125. The EEOC failed to directly refer Rubin to US DOE Office of Civil Rights, as the policies require, and instead just tells Rubin to file her Complaint there

126. On 10/31/2019, Rubin having just formalized / finalized filing the EEOC Complaint at the NYC EEOC offices; is told that the Office of Civil Rights can act on her complaint; but also indicates that they are also statutorily limited, and not able to offer the same Relief as the EEOC or otherwise. Rubin is directed to file the Complaint at the US DOE OCR.

127. In the evening of October 31, 2019, Rubin was researching OCR filing policies, continuing until sometime after 11:02 PM.

128. The policies are different enough from EEOC that a new complaint had to be draft. It was also learned that EEOC should have directly referred the case, and otherwise communicated with OCR.

129. At all times, EEOC refused to communicate with OCR, despite communications to OCR

Rubin v. NYCBOE et al
20-CV-10208    12/2021

being copied to EEOC.

130.  At all times, OCR refused to communicate with EEOC, despite EEOC communications being copied to OCR.

131.  The OCR Complaint was filed on 11/26/2019. It included a Time Tolling Waiver request.

132.  On January 27, 2020, 2 months later, OCR informed Rubin that they generally refer employment cases to EEOC.

133.  Rubin responded that they should not dismiss the case, and should communicate with EEOC, and share it, as policy indicates; and/or refer it to the Department of Justice, which has taken firm corrective actions with other school districts.

134.  The Office of Civil Right promised Rubin that they would not take unilateral action, but might put the OCR complaint on hold, pending EEOC taking final action.

135.  On February 11, 2020, OCR dismissed the case, explaining that there was an open employment case at the EEOC.

136.  OCR refused to reconsider; EEOC refused to intervene or otherwise communicate with OCR.

137.  This fiasco delayed the *Right to Sue Letter* by an additional 3 months, 10 days; ran the case right into the Pandemic, the Court closures, and EEOC refusing to issue any *Right to Sue* letters until September, 2020.

138.  EEOC refused to issue a Right to Sue Letter until September, 2020.

139.  Had the EEOC not sent Rubin to the OCR; and affirmed that they could do nothing due to the statutes not giving them jurisdiction; had EEOC stated at that time that they refuse to attempt mediation with NYCBOE due to NYCBOE refusing to cooperate; Rubin could have received a *Right to Sue Letter* by some time around January 1, 2020.

140.  As a result, the EEOC delayed and wasted eight (8) months, the time from January 1, 2020, to the release of the *Right to Sue Letter* in September, 2020; during which time EEOC kept switching its position, kept telling Rubin to provide more documents, etc., all to no avail.

141.  Therefore, EEOC, according to itself; had no jurisdiction over ADA Title II, & Title V cases; dismissed the case with no consideration on the merits. EEOC failed to provide any assistance in processing or drafting the Charges; failed to take any investigative actions, and failed to provide any assistance whatsoever.

Rubin v. NYCBOE et al
20-CV-10208    12/2021

142. EEOC refused to attempt to seek mediation with NYCBOE, explaining that NYCBOE always refused to cooperate; promising that at this Court, SDNY; the NYCBOE would be so ordered.

143. EEOC promised to assist in obtaining an attorney, and specifically said that they had a list of approved attorneys, and would give it to Rubin.

144. They failed to give it to Rubin for months. When Rubin finally got the "list" it turned out to only be a useless list of agencies, with no individuals or specific persons to contact.

**Initiation of NYSD  20 -  CV -10208 - Filed December 3, 2020**

145. This action, 20-CV-10208, was filed within ninety (90) days thereof, on December 3, 2020. It was delayed by months, directly due to additional EEOC administrative failure.

**Statutory Time Limits**

146. **Statutory Time Limits:** If one uses as the date of finalization at the in-person filing with the EEOC, at the EEOC NYC offices, then **October 31, 2019**; would be the basis for determining statutory time limits. Thus, statutes with a **three (3) year** limit allow claims back to **October 31, 2016;** including ADA, The Rehab Act, NYSHRL, and NYCHRL. Statutes with a **two (2) year** limit allow claims back to **October 31, 2017**, including NY Labor Law Sections 740-741.

**Equitable Time Tolling of at least One Year and Seven Months:**
**For 3 Year Statutes, back to March 30, 2015;**
**For 2 Year Statutes, March, 2016**
**And/Or, Continuing Violation Estoppel, back to 2012**

147. This matter has substantial basis to call into effect the Continuous Violation principle, and drag backwards several years. Plaintiff retains the right to plead Continuous Violation directly should the dates of March 30, 2015, for 3 year statutes, be disputed; and March 30, 2016 for 2 year statutes.

148. Due to two factors, Defendants' intentional actions; and EEOC accidental delays; Plaintiff is eligible for Equitable Time Tolling of at least one (1) year, and seven (7) months; or back to **March 30, 2015 for three year** statutes; and back **to March 30, 2016 for two year** statutes:

149. **A.-EEOC Accidental Delays; Actual EEOC Intake Interview was 9/26/2019:** For over one month, due to EEOC internal problems; filing the initial EEOC claim was delayed due to EEOC technology failure, and EEOC intake interview scheduling problems.

150. Over September and October, 2019, Plaintiff repeatedly attempted to make an EEOC office interview intake appointment, a prerequisite to formally filing a claim; to no avail. Plaintiff

Rubin v. NYCBOE et al
20-CV-10208    12/2021

completed the Initial Screening on 8/1/2019; a Charge form on 9/25/2019; and had a formal telephone intake interview on **9/26/2019**, which was the first of two formal Complaint initiation dates.

151.    However, to complete the intake procedure required personally bringing the Complaint, in hand, to the EEOC office in NYC, and personally appearing; for which there was no means to prearrange. On 10/31/2019, Plaintiff finally gave up on arranging it in advance, and went to the EEOC office, basing the day and time on a schedule posted on-line for walk-ins.

152.    On arrival, after a two hour commute getting there, from New Jersey; and two more hours to return; Rubin was told that the schedule was no longer operational. Plaintiff was instructed to return the following week. As the case opening documents were being scanned and formally filed, an EEOC attorney overheard and kindly agreed to finalize the intake, but failed to date it effective on the intake interview date of 9/26/2019, having failed to review the pre-existing data.

153.    **Defendants' Historic and continuing, Bad Faith refusal to mediate with EEOC caused Plaintiff to literally waste a year.** In June, 2020, while EEOC was not releasing Right to Sue letters due to the pandemic; Plaintiff was informed that EEOC would not even attempt to bring NYCBOE in to a mediation or other settlement process. Plaintiff was informed that NYCBOE always refuses to cooperate, making it a futile waste of resources. The EEOC promised Plaintiff that at the US District Court, NYCBOE would be forced to mediate, but Plaintiff has since learned that this is not true.

154.    **The Defendants' historic refusal to mediate with plaintiffs at EEOC, mirrors NYCBOE's refusal to mediate with parents; and the cause of Plaintiff's first 2014 State Special Education Complaint, due to NYCBOE refusing to even respond to a mother's repeat requests for mediation;** which appears to have been related to the retaliatory removal of Rubin from the eligibility lists on 9/30/2014.

155.    Special Education law, both IDEA and NYSED Law; requires that the school district respond to requests for mediation. NYSED SEQA ordered NYCBOE to respond. Initially, NYCBOE responded that they refused to mediate.

156.    It was only due to Rubin's diligent efforts, including petitioning to the new high school superintendent, for help, that they agreed. This yielded the incorrectly diagnosed learning disability student with service vouchers for mathematics, which, along with chemistry, he had been failing, while the M293 school Principal Drysdale and staff did not notice.

157.    A few months further into the ordeal, the new superintendent stopped helping the student,

Rubin v. NYCBOE et al
20-CV-10208    12/2021

despite his having personally and directly promised to the student that he would do so.

158.    The following summer NYCBOE ran training for teachers on how to mediate, apparently a result of Plaintiff's advocacy. However, in 2019, NYSED SEQA, on a complaint from *Advocates for Children*; cited NYCBOE for failure to participate in mediation on parental request. The NYCBOE is an habitual offender, and has no conscience.

159.    **B. -Defendants' Deliberate Retaliatory Obstruction, Delays, Weaponizing FOIL, On-going Harassment & Intimidation, June, 2018 to January, 2020 = 1 year and 7 months of Time tolling:** Defendants intentionally and barbarically deprived Rubin of her Civil Rights by refusing to give any explanation whatsoever for removal of security clearance in June, 2018; and by their weaponizing FOIL responses to continue to obstruct Plaintiff's access to her own records, through stonewalling FOIL request responses.

160.    Defendants deliberately impaired Plaintiff's ability to file a Charge, a Complaint, or to otherwise act, at any earlier date. Defendants' actions and inactions, such as in 2013, 2014, 2015, in June, 2018 and continuously thereafter; of refusing to let Plaintiff know the alleged basis for their severe adverse employment actions; using secret blacklisting; causing Plaintiff further harm and grief; these denials being manifestations of Harassment, Retaliation, Intimidation and Interference; creation of a Hostile Workplace; and forced a delay in filing any claim for from one to two full years, or until, at the earliest, July, 2019; and during which months, and afterwards, they continued to subject Plaintiff to further baseless false accusations and harassment.

161.    **B.i.-Defendants' Precipitous, Baseless, June, 2018, Security Clearance Removal, No reason or explanation given or allowed; Being an overt instance of *Prima Facie Retaliation*;** With the directly *retaliatory harassment, responsive to written FOIL requests*, being a *second major instance of Prima Facie Retaliation*, having weaponized FOIL requests and responses; Defendants retaliated by forcing delay of redress until FOIL data received, July 12, 2019; and the refused to release other documents continued through January, 2020, and many files were "lost"; all being overt retaliation to FOIL requests, instead of obeying the New York State FOIL Law and timely releasing complete documents. *A third major instance of Prima Facie Retaliation started on March 20, 2019*, on knowledge of Rubin having filed a *State Special Education Complaint*.

162.    These details of these three (3) major instances of Prima Facie Retaliation, and others, will be set out in later sections of this complaint.

163.    On June 22, 2018, Defendants precipitously removed Plaintiff's security clearance, clearly

Rubin v. NYCBOE et al
20-CV-10208    12/2021

an adverse employment action; yet refused to inform, or allow plaintiff to be informed, of the "cause"; and which was found to be false by OSI, **with no investigation**, in August, 2018.

164.    **Disparate Treatment: Cullen abuses students, Witzke supports her; Rubin helps students and parents, Witzke & van Biema file a False complaint against Rubin.**

165.    Inspired by Defendant Cullen, a general studies teacher at PS 9; who stole a letter Rubin sent to parents, *A Letter to Parents*, June 21, 2018; to help parents obtain summer compensatory services for their children; from a student's backpack. [Attachment #2 Letter to Parents, June 21, 2018]

166.    This letter, and giving it to parents, is clearly a Protected Activity under the Civil Rights and Labor statutes.

167.    Defendants Cullen, Witzke, van Biema and others; thought up a false pretense, that it was charging parents for money; which it clearly was not.

168.    Cullen, who has neither training nor education in Special Education, was well known among the school's teachers and students for yelling and screaming at students and personnel; and for calling parents in for emergency confrontational meetings, with Cullen being outraged that the students were manifesting their special education diagnoses. [Attachment #5 Teacher Certification Lookup – Cullen]

169.    Cullen showed no indication of having noticed how much her yelling disturbed the students, including those who were not the direct subject of her abusive behavior.

170.    Cullen's team teacher, Kobak, a first-year teacher, having witnessed one of Cullen's horrifying outbursts, told Rubin "To ignore" anything Cullen did or said. Which was not possible.

171.    Cullen, without special education certification of any type, with no training, without any credential to do so; was allowed to illegally give directives and was allowed to supervise and manage special education services. Witzke allowed Cullen to do this, and relied on Cullen. This violated state and federal special education law, as well as NYSED laws requiring teacher and education certification.

172.    On June 26, 2018, one of Rubin's students from Cullen's class, presented to Rubin a drawing she had just made in art class. It was a picture of Cullen, who appeared as a terrifying giant with huge teeth; demanding that the tiny child "**BEHAVE**". [Attachment #6 BEHAVE! Picture, Cullen's student, 6/26/2918]

173.    This drawing was clinically significant, especially with a child who was quiet, tried to

cooperate, and was at least of average intelligence.

174.    On the last day of second grade, this student wrote "behave" as dehav". "Behave" is considered to be a second grade skill level and standards word:

175.    **2nd Grade Literature, Math, Science, & Social Studies Spelling Lists**
How the Camel Got His Hump Spelling List
bubbling **behave** hump fetch plough camel reflection bearing idle stroke

176.    This indicates that Cullen failed to adequately instruct this student in a General Studies area.

177.    That the student continues to reverse letter "d" is due to Cullen's refusal to allow Rubin to consult with Cullen on the student's written work, and to learn methods to end the writing of reversed letters, which Rubin had shared with other classroom teachers, benefitting the students.

178.    Perhaps the presence of the second student, who was disruptive, is another reason why the student still wrote reversed letters; but who were forced into group services.

179.    Instead of properly instructing them in her own subject area; Cullen repeatedly yelled at Rubin's students, and directly scolded them for manifestations of their disabling conditions.

180.    Cullen also yelled at the special education students when they were directly complying with a command she had given a few minutes before.

181.    Cullen obstructed the students' participation in occupational therapy; and so upset the students that Rubin repeatedly had to spend treatment time helping them to cope with Cullen's behavior.

182.    Cullen repeatedly yelled at Rubin, for no reason other than seeing Rubin in the doorway.

183.    Rubin, a mandated reporter, had initiated filing a child abuse complaint on Cullen during the year, but found that the city's child protection agency refused to take the complaint, and insisted it be made to NYCBOE. Which guaranteed that it would not help, or Cullen would have already been removed from the New York City School District.

184.    Not only did the *Letter to Parents* not charge parents, but it reflected directives from the CSE, Committee for Special Education, sent to Rubin and others on May 16, 2018. [Attachment #7 OT in the Summer, May 16, 2018]

185.    Yet, while Cullen was openly manifesting child abuse of, and discrimination against, her students with special education needs and IEPs; Witzke relied on her and encouraged her to continue;

186.    Yet, while Rubin was highly credentialed and competent, and students and parents trusted her; Witzke filed a false complaint against Rubin. This was certainly Disparate Treatment.

Rubin v. NYCBOE et al
20-CV-10208    12/2021

**June 22, 2018 - Immediate, Prima Facie Retaliation**

187.    The details and documents will be provided in a later section.

188.    Using the ruse of the *Letter to Parents* charging parents for services; on June 22, 2018, Defendants removed Plaintiff's "eligibility" status on the Roster.

189.    Also on June 22, 2018, Defendants placed a "Problem Code" on Plaintiff's employment record.

190.    On August 20, 2018, without ever "investigating" Plaintiff Rubin, and despite Epstein's continually filing additional false complaints; OSI dismissed Witzke and Epstein's complaint as ***Unsubstantiated***, ***No Further Action***, (NFA).

191.    The Defendants then maliciously failed to let Plaintiff know that OSI had cleared her of misconduct, without even needing her input, but also giving no opportunity to correct erroneous information.

192.    The Defendants had a duty to restore all that they had taken from Rubin, her security clearance, eligibility status on rosters; and a duty to remove the Problem Coding.

193.    Defendants had a duty to restore Rubin to her position at PS 9.

194.    They failed to do so.

195.    The cover sheet for this case was never released to Rubin, nor were any until December 2019.

196.    The cover sheet directed the accusing parties to restore the victim of their false accusations.

197.    The cover sheet states;

> INSTRUCTIONS…
> If this matter was **UNSUBSTANTIATED**… please return him/her to service immediately.
> -From standard form ***Office of Special Investigations, Closing Memorandum***.

198.    **-** Of which policy and form Plaintiff only learned through a December, 2019 FOIL release, which gave the OSI Case Closure cover page for prior retaliatory false accusation complaints, or for complaints Rubin had made; but which Case Closure cover page for any of the five (5) false complaints lodged in June to July, 2018; was never released; and never released on most of the requested documents.

199.    At all times, they refused to allow any due process to resolve the fictitious accusations. Equally shocking, in July, 2018, Defendant Epstein submit Plaintiff's valid and worthy email requests for information as to the alleged basis for their adverse employment actions; as a cause

Rubin v. NYCBOE et al
20-CV-10208    12/2021

of action for another formal complaint against Plaintiff, to SCI & OSI, calling them "unsolicited". Shortly afterwards, within days, OSI swiftly & correctly screened that out, along with other similarly false and harassing formal complaints made in July, 2019; with NFA, No Further Action, results. The evidentiary proofs are clearly written in their own documents.

200.    However, SCI, OGC, and OSI, all failed to train, reprimand, or otherwise re-educate Epstein, Witzke, Cullen, Lantzounis, Van Biema and the others who initiated the false accusations. They failed to instruct them that retaliation was a violation of Federal, State and Local Laws.

**Prima Facie Retaliation – Weaponizing responses to FOIL Requests**

201.    **B.ii.-Defendants' Year Long, Intentional and Retaliatory, Incomplete and Delayed, FOIL Responses, January, 2019 to January, 2020**:

202.    Starting in January, 2019, through January, 2020, overlapping the initiation of the "10/31/2019" EEOC Complaint; through FOIL requests; Plaintiff diligently sought Plaintiff's own employment records, seeking the "cause" of the Defendants' June, 2018, Adverse Employment actions, and of those taken before.

203.    That Rubin did not know of these instances is further proof of the existence and use of secret Blacklisting.

204.    The Defendants, and specifically Defendant Baranello, working in coordination with other defendants, apparently Defendant Lees in particular; used the FOIL system as a weapon of further retaliation, continuous with prior harassment and deprivations.

205.    Each request was followed, not with lawful release of documents; but instead with egregious and harassing delays; with extreme and lawlessly redacted documents if and when finally released.

206.    As such, each response to Rubin's FOIL requests was a retaliation to Rubin's request.

207.    Defendants, acting through Baranello and Lees; aided and abetted in their retaliation; in the review and decision making pertaining to making releases to the FOIL requests; stonewalled Rubin's attempts to get information, by causelessly delaying release for up to six months, where 21 days is allowed; by severely redacting those released, beyond any lawful basis; by forcing Rubin to repeatedly make requests, even the same ones; to repeatedly make appeals; and to expend hours, days, weeks and months, tracking the late responses; and to even appeal directly to the Chancellor, possibly yielding the July 12, 2019 releases.

208.    They later refused to release documents claiming that the documents were exempt by prior

Rubin v. NYCBOE et al
20-CV-10208    12/2021

requests which they themselves had refused to produce; or that they claimed did not exist; while other documents, including ones received from them, showed that they did exist. This unreasonably forced Plaintiff to expend large amounts of time and other personal resources trying to obtain information from her own records, over the course of over a year.

209.    By forcing Plaintiff to battle to obtain the defamatory material from years 2012 to 2019, Defendants brought forward a continuation of the prior harmful retaliation. By this harmful FOIL process, as well as in documents which they themselves produced; the Defendants themselves brought forward the prior years' abuses into the current statutory time frames.

210.    **B.iii. – Defendants' Five month long, Prima Facie Retaliation attack, March to July, 2019; responsive to Plaintiff's Protected State Special Education Complaint:**

211.    The is an introduction to this subject, to be covered in further detail in the following part.

212.    On March 20, 2019, Defendants, on learning that Plaintiff had compiled a report and *State Special Education Complaint* on the severely substandard occupational therapy program at the Sarah Anderson School, M 009, in school year 2018-2019, and over prior years, from SY 2014 through November, 2017; immediately, that day, by Epstein's hand; retaliated; by filing a false and harassing complaint to SCI, and thus to OSI. [Report to be attached elsewhere]

213.    The report was entitled, *A State Special Education Complaint Based upon a Therapist's Compliance Audit,* that being a Protected Activity for Plaintiff; and which was endorsed by the NYSED SEQA, having validated the report in their May 17, 2019 findings and Corrective Action Plans [Attachment #4]. NYSED SEQA complemented Plaintiff on her diligence in protecting student identities;

214.    This reporting of information, to authorities; under medical, health, safety, educational neglect, and child abuse protection laws; and for parental rights to informed knowledge; are specifically permitted and even required, in multiple laws and regulations, including those of the Chancellor.

215.    The SY 2018-2019 substandard conditions were directly due to Plaintiff's forced absence therein, and the Defendants re-institution of substandard and illegal practices. The Defendants, and specifically van Biema and Epstein; have implemented policies and practices which have directly institutionalized behavior which is professional malpractice, including providing services with no baseline, measurable objectives or treatment plan in use; and of mandatory false certification of occupational therapy sessions which did not occur; by licensed occupational therapists; which in the rehabilitation field is actionable fraud.

Rubin v. NYCBOE et al
20-CV-10208    12/2021

216.    **The PEP, Panel for Educational Policy, aka NYCBOE; is reimbursed for billings for sessions which did not occur; Then proclaims the Vendors to be Responsible.**

217.    That Defendants are actually aware of the prohibition against billing for services which were not provided, is seen in the Panel for Educational Policy meetings on Vendor Responsibility. The PEP is the new term for the NYCBOE. [Attachment #8, PEP Meeting on Vendor Responsibility, August 23, 2017. 4 pages.]

218.    For example, the August 23, 2017 PEP meeting notes discussed incorrect billing for 600 therapy sessions by Spot with Theratalk, and their reimbursement of $38,160.00. However, as a result of this corrective action, DOE decided that Theratalk "is deemed to be responsible."

219.    Comprehensive Psychological Services, PC, was found that an occupational therapist working for them, was *investigated for fraudulent timekeeping practices, and that* **she had billed for sessions she did not perform.** *The Vendor immediately removed the therapist from DOE work, and did not bill the DOE for any outstanding amounts attributable to her work, reimbursed the DOE $33,323.00 for prior erroneous billing that already had been paid and provided a corrective action plan.*

*220.*    However, despite that and two other similar problems from this vendor, PEP, as NYCBOE, decided that *the vendors are determined to be responsible.*

221.    **Medicaid and Other Frauds**

222.    As NYCBOE is participating in and receiving Medicaid school reimbursement, and certifying students as having a Medical Necessity for the treatment. A basic requirement to meet the Medical Necessity standard is for the patient/student, to objectively show progress and make gains. If there is a lack of improvement, then it is considered as merely Maintenance services; which, in the case of occupational therapy, is not considered to be a Medical Necessity. The false certifications as Medicaid Fraud. To provide occupational therapy without making documented gains is not Medical Necessity, and not allowed payment under Medicaid, and so billing is Medicaid Fraud.

223.    The SOPs fraudulently claim that individual students have received mandated services, which they did not receive, and which are thereafter treated under the false pretense of having occurred; and which directly deprives special education students of those falsely certified mandated therapy services.

224.    This particular manner of systemic service delivery failure has been causing students to suffer the loss of an average of 20% of the mandated services.

Rubin v. NYCBOE et al
20-CV-10208    12/2021

225.    As seen in their immediate attack on Rubin and the report, followed by burying the results and Rubin's bringing proofs to SCI and OSI; apparently the Defendants NYCBOE, the SCI and the OSI; are more concerned about keeping secrets then about the safety and well-being of the students, or caring about Medicaid Fraud.

226.    The Defendants' actual gripe is that they were upset that parents learned what was being done to their children; and that the Defendants were being held to account. The parents had and have a right to know. The Defendants have a duty to disclose.

227.    In fact, regardless of Defendants' refusal to be held accountable to their duty to not retaliate, under Federal, State and Local law; Plaintiff had a professional ethical duty to bring the facts of the abusive and lawless practices to the authorities, a.k.a. bona fide Whistleblowing; and to inform the affected students' parents of these facts.

228.    Plaintiff had also been lawfully authorized, by the RSAs.

229.    All nineteen (19) parents whose children had been subjected to the abusive deprivation of services received a copy of the March, 2019, 45 page report, and also of the NYSED SEQA correspondence: the initial 4/9/2019 NYSED SEQA letter, 3 pages; and the 5/17/2019 NYSED SEQA investigation report results and CAPS, 10 pages; as they issued.

230.    Plaintiff personally paid the costs of printing and mailing by USPS Priority Mail.

231.    Defendants absurdly complained that Plaintiff had shared information with parents, about their children; information which the Defendants had refused to honestly share.

232.    Defendants immediately, literally on the same day they learned of the March, 2019 *State Special Education Complaint* report, retaliated and filed a complaint against Plaintiff to SCI and OSI. Thereafter, Plaintiff was continually harassed, intimidated and abused. This included sudden demands to appear in Brooklyn, being told that she could not have an attorney with her; while Plaintiff repeatedly reminded the Defendants, in writing, that it was a protected activity, and that their behavior was illegal; to no avail.

233.    In May, 2020, the Defendants fraudulently used their false, deceptive, defamatory and slanderous reports from June, 2018, and March to July, 2019; and selectively and fraudulently submitted parts of them to the EEOC. Most written statements in the Defendants' reports were completely fictitious, a complete disconnect from the facts and reality.

234.    **Defendants' Harassment forced time expenditure equivalent to a full time job.**

235.    These above-described behaviors and actions of the Defendants, which were on-going harassment and retaliation; both forced Plaintiff to seek legal redress; and yet at the same time

Rubin v. NYCBOE et al
20-CV-10208    12/2021

directly and intentionally made it impossible.

236.    Defendants directly caused at least an additional year delay in seeking redress and in initiating any complaint; and caused Plaintiff an additional year of pain and harm; with Plaintiff being forced to continually deal with these defamatory and traumatizing demands.

237.    This harassment, in turn, significantly impeded Plaintiff's ability to seek and obtain employment, and also made it impossible to start up a professional business, and caused additional economic injury. The harm, pain and losses continue to compound to the current day.

### Section 11. Employee Misclassification Fiasco & The Economic Realities Test
### EMPLOYEE MISCLASSIFICATION FIASCO
### Partial Predicates to Employee Status
### A.  Employee Status Statement / Economic Realities Test - Res Judicata
### The US District Court's Duty to Place Controls on the NYCBOE

238.    Instead of behaving in a law abiding and respectful manner, Defense will falsely claim that Anti-Retaliation laws do not apply to them. That is their only defense.

239.    Instead of respecting the rights of students and parents to have advocates, instead of continually striving to provide better quality services; instead of demanding excellence across the NYC School District; The Defendants only seek to be free to cause more harm; whereas they deserve a Go to Jail card.

240.    Someone or something has to put the NYCBOE under control.

241.    That "someone" is this U.S. Federal District Court, New York, Southern District.

**Plaintiff is a misclassified employee; as are most other Therapists working under RSAs; and certainly those called "Independent Providers".**

242.    By definition, an *Independent Provider* is a direct employee of NYCBOE.

243.    Rubin, and likely all the other "Independent Providers" working under the RSA system; are misclassified, that being the "reason" given by NYCBOE for causing them harm – NYCBOE believes it can get away with bullying everyone, and to date they have; to the detriment of students and parents.

244.    Regardless of recent statutory amendments to the NYSHRL and the NYCHRL; of the dating, or employment status required or not required; Rubin has been continuously employed by the NYCBOE, and continues to be an employee of the NYCBOE;

245.    Rubin's activities in 2019, about which Defendants so harshly complain; were, in fact, in the service of NYC & the NYCBOE. Plaintiff continued to work for NYC Schools, NYCBOE, for the students and parents of NYC, from September, 2018 through August, 2019, uncompensated.

Rubin v. NYCBOE et al
20-CV-10208    12/2021

It was a legal, ethical and ethical duty. It was Right Doing, Righteous Behavior.

246.    In Occupational Therapy Standards of Practice, as previously provided to SCI and OSI; Advocacy for students and patients; is considered to be the highest level of professional performance and achievement. It is proclaimed to be exemplary.

247.    In fact, even this action at Court is in the interests of NYC Schools and the NYCBOE, as it is unable to self-correct its malfunctioning, as seen in the continual parental and employee law suits, and the NYCBOE's inability to provide Fair Hearings in Special Education, requiring appointment of a Master.

248.    That said, Plaintiff's work and employment clearly passes the Economic Realities Test as an Employee of New York City BOE;

249.    – Plaintiff Rubin, having been repeatedly denied work while student mandates and needs are not met; while NYCBOE intentionally deprived Rubin of a means of support; has repeatedly been found to be an employee by the New York State Department of Labor.

**NYCBOE has never contested employee status with the NYS DOL; making it Res Judicata.**

250.    One time a vendor did, and lost.

251.    As expected, NYCBOE was consider a co-employer with the vendor, by NYSDOL.

252.    Plaintiff has passed any and all other tests of employee status classification; albeit as a maltreated and abused employee.

**Statutory Employee Status Predicates**

253.    This section will provide an overview of the underlying statutory requirements, of Plaintiff's Employment status, as impacted by defendants' policies and behavior.

**B. The RSA Voucher System Prohibits Replacement Personnel, indicating Employee Status under the Economic Realities Test, and as specified by the NYCHRL 2018 Amendment, and Others:**

254.    See also above, Employee Misclassification Proven by the RSAs Terms, items 18 – 28.

255.    The NYCHRL definition of *employer*, is precisely and specifically equivalent to the legal requirements for an "independent provider" to use an RSA (Related Services Agreement).

256.    The NYCHRL, as amended on January 18, 2018, effective October 18, 2018, states:

**The New York City Administrative Code, Title 8: Civil Rights**
**8-102 Definitions. Employer.** … For purposes of this definition, natural **persons employed as independent contractors to carry out work in furtherance of an employer's business enterprise who are not themselves employers shall be counted as persons in the employ of such employer.**

257.    This reflects the Economic Realty Test analysis, which has predated all the recent

Rubin v. NYCBOE et al
20-CV-10208    12/2021

amendments, validating its use in general, and as the intent of NYCHRL.

258.    A basic component of a real independent contractor is that they can negotiate their fees; whereas there is no negotiation for the rate set for RSA for occupational therapists, which has not changed since at least 2012.

259.    A basic element of being in business for yourself is that you can negotiate on the terms and conditions, whereas with the RSA, it is preset, and there is no negotiation allowed whatsoever.

260.    A true Independent Contractor obtains a service contract, and is free to fulfill it as he sees fit. He can get workers to complete the contracted tasks.

261.    On the contrary, RSA vouchers are specifically granted only to specific individual therapists, for specified, individual students, to implement the mandated services from the most current IEP.

262.    RSAs include language specifically forbidding the use of alternative personnel. It is not allowed to be "contracted out" or "subcontracted

263.    The RSA (Related Service Agreement) (excerpt) states:

*264.*    ***Terms 1 through 6***

265.    *2. The DOE will pay only for the provision of direct service by the Provider identified in Section III of this form. Service **cannot** be provided by any other individual…*

266.    The bold and underlined text is from the RSA itself.

267.    The RSAs do not even allow for a substitute person in the case of illness of the provider.

268.    This inability to hire someone else to fulfill any of the contract is an indication of an employer - employee relationship.

**NYCBOE PRETENSE DENIES "Independent Providers" Essential Worker Rights**
-    NYCBOE DEFRAUDED PLAINTIFF OF RIGHT TO JOIN UNION, OF RIGHT TO BE COMPENSATED FOR LABOR, & FLSA RIGHTS.
**NYCBOE Defrauds workers of Right to Join Union; & Deprives Rubin of Compensation due for SESIS time**

269.    NYCBOE Defendants, using of the ruse of "contractor" and "independent provider"; have defrauded Rubin of rights and protections under Labor Law, the Right to join a Union, the right to be compensated for labor, right to be compensated for time spent on SESIS, right to file a grievance, of FLSA enforcement; and for therein causing Plaintiff to suffer to work.

270.    Defendant NYCBOE has similarly defrauded all the "Independent Providers" currently on the rosters; and those who left.

271.    By forcing the Plaintiff to work in the RSA [Related Services Agreement] voucher system, Defendants removed the Due Process Protections and Benefits of recognized employee status;

Rubin v. NYCBOE et al
20-CV-10208    12/2021

and union membership. Almost all of the vendors do the same.

272.    NYCBOE Office of Related Services is pretending that all of the therapists who work for them based on the RSA system – Related Services Agreements, Vouchers – are THEREFORE Independent Contractors; and that, BECAUSE they are "Independent Providers", the NYCBOE cannot be held to account for abusing us by any law.

273.    This is despite the fact that there is no negotiation whatsoever as to the billable amount per session hour.

274.    In fact, not only has the rate of payment for occupational therapy services, under RSAs, not increased since at least 2012;  Instead, there have been continual additional duties required, easily increasing minimal additional time by 50% for "Independent Providers, who already had oppressively additional documentation requirements, such as having to manually copy and recopy services provided for billing, onto different versions of forms; yet have no forum in which to have it addressed.

**While "Independent Providers" have had additional duties and no additional compensation; Full Employee Status therapists have had lessened duties, at a loss of service quality; and additional compensation.**

275.    The unreasonableness of this is highlighted by the fact that over the same years, full employee status therapists have had duties decreased.

276.    On June 1, 2015, NYC DOE and UFT issued a letter, which included ORS Executive Director and Defendant van Biema; giving Notice that full employee status therapists were no longer required to write and file Annual Review Plans. "Independent Providers" continued to be so required. The letter discussed development of some alternative means to achieve the same clinical treatment planning objectives, but it was never done. [*Attachment #9 NYCDOE/UFT 6/1/2015*.]

277.    The direct result is a gross decline in quality of therapeutic services by full employee status therapists.

**$33,000,000 2017 Compensation for Personnel Time on SESIS – The second one**

278.    There has been SESIS Time Compensation for Full Employee status therapists for years, going back to a September 7, 2017 arbitrated agreement, and an earlier one, from 2013. [Attachment #10  *UFT Topics in the News: SESIS*, 3 pages]

279.    The first Agreement calculated based on time spent on SESIS outside work hours.

280.    In Rubin's case, that has meant all time on SESIS, as defendants have failed to ever provide on site resources.

Rubin v. NYCBOE et al
20-CV-10208    12/2021

281.    The one from 2017 was based on *set ranges of hours using SESIS over the covered time period, with dollar amounts ranging from $50 to more than $10,000.*

282.    On 9/7/2017, UFT announced an agreement to pay $33,000,000 to cover past time expended on SESIS; including payments to retirees; with none for "Independent Providers".

283.    The UFT rule established that: *UFT-represented employees who averaged more than five minutes per week of SESIS use between January 2013 and June 2016 will receive payment for their work in SESIS…*

284.    Rubin repeatedly attempted to join UFT, but was either ignored or denied.

285.    Rubin should have been, and should now, be allowed to benefit from these and the subsequent payments.

286.    UFT even has a grievance form dedicated to filing SESIS grievances. [Attachment #11: *Gathering SESIS information*] It advises:

287.    **Gathering SESIS information in preparation of a union-initiated grievance**
Have you had to work beyond your regularly scheduled work day within the past 30 school days
**due to one or more of the following SESIS-related issues?**
Lack of/insufficient equipment
Lack of access to equipment, e.g., the only fax machine is in the principal's office and I am only given access after school
Equipment failure or incompatibility
Unable to get assistance via help line/inordinate amount of waiting time on help line
Lack of adequate Bandwidth to complete tasks
Lack of Bandwidth access

288.    By depriving Rubin of recognized employee status, NYCBOE also denied Rubin, and all the other Independent Provider therapists and teachers; the essential worker right to join a union; and denied Rubin the benefit of the union-arbitrated agreements, which should then, and thus now, be applied to Rubin's benefit.

289.    To this date, and including all the dates subject to this Complaint; SESIS time compensation benefits have been in effect.

290.    In SY 2017-18, while Defendants were vigorously harassing Plaintiff; Plaintiff should have been able to seek and receive compensation for time on SESIS.

291.    In SY 2018-19, while Defendants were making false accusations due to being revealed for having their pants down, Rubin should have been compensated for the extensive time spent on SESIS, gathering the data and proofs of their gross misconduct and fraud.

292.    And Rubin should now receive said compensation for all the "excess" time spent, through 2019; with interest.

Rubin v. NYCBOE et al
20-CV-10208    12/2021

293.    Yet Defendants have obstructed Plaintiff from making this claim in a precise manner, by perverting the FOIL process and law; by intentionally denying Rubin access to the SESIS logs necessary to so calculate.

294.    Defendants have defrauded Plaintiff of employment rights, on top of the right to join a union.

295.    Therefore, unless Defendants immediately grant Plaintiff access to her SESIS account and logs, the time owed for said employee labor will be billed based on the limited data in the UFT reports.

296.    Because the manner in which NYCBOE forces "Independent Providers" to operate, we have a tremendous amount of additional time spent on SESIS, and with no resources provided.

297.    The minimum annual expense is the maximum stated: $10,000 per year.

298.    Years 2017 through 2019 required much greater time, with a relative estimate of $30,000 each of the two years.

299.    This calculation, with interest, is herein added to the calculation for compensatory damages, back pay and front pay, to the current date; due, plus interest.

300.    This covers 9 years, from SY 2013-2014, through the current SY 2021-2022.

301.    This is calculated at $130,000.00 plus interest.

**Alternatively, OR In Addition: DEFENDANTS OWE CONSULTATION AND TRAINING FEES – IN EFFECT AS OF THEIR *REQUEST FOR SERVICES* NOTICE, JUNE 26, 2018; and Responsive June 28, 2018 Notice from Plaintiff**
**Additional False Statements from Lees & Lantzounis**

302.    On June 26, 2018, at 2:45 PM, Epstein sent Rubin an email, pointing out that she had removed Rubin's Security Clearance: [Most of these documents will be provided in a later section]

303.    **From: Epstein Susan SEpstein5@schools.nyc.gov**
**Sent: Tuesday, June 26, 2018 2:45 PM**
**To:** E XX
**Subject:** Notification Regarding Your DOE Clearance Status
Please see the attached notice regarding your clearance with the DOE.
**Sue Epstein**
**Director, Compliance & Contract Management**
Office of Related Services
NYC Department of Education
28-11  Queens Plaza North, Room 508
28-12  LI City, NY  11101
sepstein5@schools.nyc.gov

304.    Epstein's Notice failed to give any information whatsoever as to the cause of said removal of clearance; Epstein refused to do so continuously; and also refused to give or allow any means

Rubin v. NYCBOE et al
20-CV-10208    12/2021

of reinstatement.

305.    Responsively, on June 28, 2018, Defendants, including Epstein, Witzke, and 3 others; received a ***NOTICE OF CONSULTATION AND TRAINING FEES: [excerpt]***

306.    On Tuesday, June 26, at 2:45 p.m., Ms. Sue Epstein sent me a notice informing me that she personally, that Principal Witke, Superintendent Altschul, and others; were in dire need of consultation and training to enable them to provide better quality of services to NYC's children; and asking me to spend significant time in providing them with consultation and training services.

307.    As this is going to require significant amounts of time, labor and efforts for me to do; that the time used will make it impossible for me to participate in other forms of gainful employment; and it not being lawful to force an employee to "Suffer to Work" without compensation; **you are herein given Notice that all time expended in this endeavor will be billed to the Sarah Anderson School, PS M 009.**

308.    My established rate is $90.00 per direct service hour, but these services are of a higher level of expertise. Therefore the billing rate, unless otherwise negotiated and mutually agreed to within 24 hours, will be $180.00 per hour,...

309.    There was no response, no disagreement with the rate or description of work.

310.    This Notice would specifically cover the labor which followed, including the work to produce the March 2019 State Special Education Complaint.

311.    June 29, 2018, EPSTEIN AGREES & ADMITS THAT SHE CUT OFF RUBIN'S SESIS ACCESS – WHILE IN LEES' July 12, 2019 REPORT; SHE ABSURDLY REPORTS and QUOTES LANTZOUNIS STATING THE OPPOSITE:

312.    The June 2018 email correspondence shows that Epstein, Witzke and all the others; knew that they had cut off Rubin's access to SESIS. In fact, Rubin told them, and complained about it impeding necessary work including documentation.

313.    On Friday, 6/29/2018, at 2:12 PM, Epstein agreed that she had shut Rubin out of her SESIS account:

314.    Epstein wrote:

315.    ***… Your inability to access SESIS… is a result of your loss of DOE clearance.***

316.    - Yet Epstein continued to refuse to give any reason for the loss of the clearance.

317.    Epstein sent this and similar statements out to a large list of people copied, including to SCI and OSI.

318.    A year later, Lantzounis made false statements to Lees in her Witchhunt report, aka an "investigation", completed on July 10, 2019. Lees' Report quotes Lantzounis.

319.    Lees wrote:

320.    *On June 7, 2019, … interviewed Ms. Lantzounis by telephone. Ms. Lantzounis said that Ms. Rubin continued to have access to the Special Education Student Information (SESIS) following her termination.*

321.    [NOTE: It appears that they never required accusers to come to their offices, only those

Rubin v. NYCBOE et al
20-CV-10208    12/2021

falsely accused.]

322.     It is not possible that Lees and Lantzounis did not know that, in fact, Epstein had, in fact, successfully shut Rubin out of SESIS effective June 26, 2018.

### C.  Statutory Requirements pertaining to Employee Status

323.     **ADAAA and The Rehab Act:** Both statutes apply regardless of employment status, allowing for any "aggrieved persons", or "an individual", "any individual", "against any individual", etc.

324.     As the remedies to an employee might be applied differently from those pertaining to a contractor; Plaintiff states that she is, in fact, an Employee for the purposes of the causes of action and relief pertaining to the ADAAA and The Rehab Act.

325.     Both the **NYSHRL and the NYCHRL** were amended to include coverage of all rights and relief to "independent contractors" who were directly providing services, as though employees. The one for the NYSHRL was in effect on October 11, 2019. The one for the NYCHRL was in effect as of 10/18/2018, under year 2018, Local Law #63.

326.     These amendments were all effective prior to the filing of this case in court. Some were in effect prior to the filing of the 10/31/2019 Complaint to EEOC. Events covered in this Complaint overlap these amendments.

327.     All incidents of harassment and retaliation, including the Prima Facie case of Retaliation in March, 2019, the refusal to restore the security clearance, and other deprivations, such as lawless removal and failure to restore, various Roster eligibility status, the refusal to give a reference; are all directly included in the Amendment.

328.     Nevertheless, as shown above, the Amendment merely reflects the Economic Reality Test, and the same principals apply even prior to or regardless of, Local Law #63; and therefore, as the RSA requirements are directly lined up with both the language in the Amendments, as well as under Economic Reality Test analysis.

329.     As the remedies to an employee might be applied differently from those pertaining to a contractor; Plaintiff states that she is, in fact, an Employee for the purposes of the causes of action and relief pertaining to the NYSHRL and the NYCHRL.

330.     **New York Labor Laws Section 740 & 741** were not amended as to employee status. Pertaining to these statutes, Plaintiff states that she is, in fact, an Employee for the purposes of the causes of action and relief pertaining to the NYLL 740 & 741.

### D.  Cascade System flaws lead to New York State Department of Labor (NYSDOL)

Rubin v. NYCBOE et al
20-CV-10208    12/2021

### Uncontested Finding Plaintiff is an Employee. Res Judicata.

331.    The ineffective "Cascade System", as shown in the March, 2019, *A State Special Education Complaint Based upon a Therapist's Compliance Audit,* and in the investigations and findings of the NYSED SEQA; directly prevents available therapists from picking up caseloads, therein forcing them to remain without work for 4 or more months per year; while student mandates remain unmet.

332.    The combination of the Cascade System and SOPs to not fill positions in June are a Workforce Nightmare, as the therapists are needed, yet forced to seek more regular work elsewhere due to the policy driven, limited, 8 month work year; with no guarantee of continued work the following year.

333.    Through the Cascade System, the Defendants, combined with their other attacks on Plaintiff's rights to work; repeatedly forced Plaintiff onto unemployment benefits during the summers and into the first months of each school year.

334.    Each time, the New York State Department of Labor (NYSDOL), after investigation, including the use of numerous questionnaires; found that Plaintiff was a misclassified worker, and has been an employee.

335.    At no time did NYCBOE contest the determinations. NYCBOE never sought a hearing. At no time did NYCBOE dispute Plaintiff's Unemployment claim, which was based on Employee Misclassification.

336.    In 2014, a major, for profit vendor decided to fight it. He lost.

337.    However, the NYCBOE contracts with vendors assume an employment status worker. How else can they be waiting around and ready to report when an opportunity presents?

338.    The Defendants refuse to enforce that or the other quality components of the contracts.

339.    **E. No Contract = Not a Contractor; BUT Def. Epstein fraudulently claims one:**

340.    While the existence of an Independent Contractor contract does not prove non-employee status; the lack of one is an indicator of employee status.

341.    Defendants claim that Plaintiff is an "Independent Contractor", not an employee. They have failed to produce the underlying contract. It does not exist. They have not provided any proofs, or documents to support their claim and beliefs.

342.    A following section will set out the FACTS of what actually transpired during School Year 2017-2018; with the Defendants' continual demands, exceedingly and increasingly invasive supervisory demands, showing that they viewed Rubin as an employee, not a contractor; and wit

Rubin v. NYCBOE et al
20-CV-10208    12/2021

their harassment and creation of a hostile work environment.

343.    The Defendants continually imposed an exceedingly high and invasive degree of control over Plaintiff's work. They believed that Plaintiff had to yield to their opinions and preferences, even if it violated basic professional and ethical standards.

344.    **August 1 and 16, 2019: Epstein tells OSI Investigators that Rubin Violated the Nonexistent Contract**

345.    It is not possible that Epstein, the Director of Compliance and Contracts for the Office of Related Services, actually believed what she told the OSI Investigator. Epstein had to know that Rubin had no Vendor Contract, yet Epstein elaborately claimed she did, and had violated it.

346.    In July, 2018, still attempting to defend her June 22, 2018 complaint to SCI/OSI; Defendant Susan Epstein, Director of Compliance and Contracts for the Office of Related Services, told OSI investigators that the Plaintiff was subject to the 138 page formal Vendor Contract, and violated the "Cascade System". [Attachment #12: *OSI No Further Action Memorandum*, August 20, 2018, Composite version, 2 pages]

347.    While this issue and the content of the June 22 complaint to SCI and the follow-up to OSI, will be covered in more depth later, it will be helpful to place excerpts here. Note: this content is a composite from FOIL releases on April 15, 2019, and July 12, 2019:

348. On August 1 and 16, 2018, the assigned investigator interviewed Susan Epstein, Director, Compliance and Contract Management, Office of Related Services, via telephone. Ms. Epstein explained that the Cascade policy explains the order in which providers are selected and offered work to provide services to students. First choice is always a DOE employee. If one is not available, DOE will contact DOE approved agencies and/or independent providers. Ms. Epstein clarified that DOE gives work to the provider. The provider should not solicit business from parents without DOE's approval. According to Ms. Epstein, Ms. Rubin violated the Cascade policy because the letter she sent to parents implied that she solicited business for a fee.

349. Footnotes Page One: 1. The letter, dated June 21, 2018, does not indicate that Ms. Rubin requested payment for her services.

350. Page 2
Ms. Epstein confirmed that the Cascade policy is not a Chancellor's Regulation and not a conflict of interest issue. The policy is part of the contract between DOE and the provider.3

351. However, according to Ms. Epstein, the contract does not indicate that providers are not allowed to solicit business from parents.

352. Furthermore, Ms. Epstein stated that Ms. Rubin did not receive training or a handbook indicating that a provider cannot solicit business. She asserted, "it goes without saying" that this practice was not permitted.

353. **There is no indication that Ms. Rubin charged or accepted payment from a parent for any services.**

354. On August 16, 2018, the assigned investigator conferred with Deputy Director Nowak

Rubin v. NYCBOE et al
20-CV-10208    12/2021

and it was determined that no further investigative action would be taken at this time. This matter is closed.

355. Footnote page 2          3 A copy of the contract, which is a 138-page document, is part of OSI's database. The Cascade Policy is located in section 1.10 page seven.

356.     **However, this contract does not apply to Plaintiff, who never signed it, nor was it ever presented to Plaintiff to sign.**

357.     **How is it possible for NYCBOE to have the Director of Compliance for the Office of Related Services; to openly and intentionally lie to the Office of Special Investigations? And not be punished?**

358.     It is only used with the large for-profit vendor corporations, as cited in the PEP Vendor Responsibility Report [Attachment #8].

359.     Virtually everything which Epstein said to the OSI Investigator was a malicious lie.

360.     It is not even plausible that Defendant Susan Epstein, the Director of Compliance and Contracts for the Office of Related Services for NYCBOE, which contracts out multi-millions of dollars each year; did not know that Plaintiff had not, in fact, signed or otherwise been subject to that contract.

361.     It is not possible for Epstein to not know that "Independent Providers" do not use the Vendor contract. If someone earns over $100,000 in one year, they might need to sign a Vendex contract, which is not the same as the ORS one.

362.     She has purposefully misrepresented and falsified the essential nature of the employee / employer relationship.

363.     Similarly, Def. Epstein must know that Independent Providers have no control over the Cascade System, and that this is by design – Van Biema's and hers.

364.     Independent Provider therapists have no duty to support or enforce the Cascade System, yet Def. Epstein absurdly claimed it as the basis for removing Plaintiff's security clearance, Eligibility, and to be "Problem Coded".

**F. Plaintiff's 6/25/2018 NOTICE of Right and Duty to keep her position at PS 9.**

365.     On 6/25/2018, Plaintiff Gave Notice & Claimed, had a Right and a Duty, to Remain in her Position at M009 for the summer of 2018, and for the school year 2018-2019;

366.     Defendants had a Duty to Continue Plaintiff's Employment, and to Not Violate IDEA and NYS Education Law, nor Civil Service ADAAA or NYCHRL:

367.     IDEA and NYS Education Law require that all mandated services be in place at the beginning of each school year.

368.     In March, 2019, Plaintiff again complained of the NYCBOE failure to start services at the beginning of the 2018-2019 school year, to NYSED SEQA.

Rubin v. NYCBOE et al
20-CV-10208    12/2021

369.    The NYCBOE refuses to fill positions at the end of the school year for the coming year, directly causing problems in compliance and lack of services in September.

370.    Then in September, they implement the cumbersome and time-consuming Cascade System, which frequently directly causes a two or more month delay of services starting in the new school year. This occurred at M009.

371.    The Office of Related Services' standard policy has been to wait until after the school year began to address staffing needs, and directly causes:

372.    -A loss of mandated services;        -A loss of skill development

373.    -A loss of educational achievement-A loss of student FAPE rights; and

374.    -Violations of State and Federal Law.

375.    In May, 2019, NYSED SEQA cited the Sarah Anderson School for violating this law, and ordered it to be corrected; that services be in place on the first day of school in 2019. They failed.

376.    As of June 22, 2018, Def.s had failed to hire a new therapist for the 2018-2019 school year. They were too busy maliciously harming Plaintiff, which was more important to them then providing students with mandated services.

377.    Def. Epstein was positively obsessed with getting rid of Plaintiff, filing a series of 5 worthless SCI / OSI complaints against Plaintiff between June 22 and July 25, 2018. Perhaps Epstein's boss, van Biema, told her to do this.

378.    Rubin did not receive any notice on any of them at any time; Epstein refused to tell Rubin, or let anyone else tell Rubin, the basis for the precipitous removal of her clearance.

379.    On Monday, June 25, 2018, not knowing about the Defendants' secret and causeless termination of her clearance and the Wrongful Termination; Plaintiff gave written Notice to Defendants that she would continue in her current position at the Sarah Anderson School; and that the position was, therefore, no longer open.

380.    Plaintiff had taken and passed the NYC Civil Service test for Occupational Therapy; - Had seniority in her position at M 009; -While at the end of June, 2018, no replacement had been found for the 2018-2019 school year, and -Plaintiff also had a professional ethical duty to not allow her students to be abandoned (a professional term); especially given the loss of 2.5 months of services, or 25% of mandated services; with OT only starting in mid-November, in SY 2017-2018. [See March 2019, *Therapist's Compliance Audit and State Special Education Complaint* ]

381.    In many states, including New Jersey under education law; there is a legal duty to neither terminate nor leave a therapy position, without a committed replacement therapist. These are

Rubin v. NYCBOE et al
20-CV-10208    12/2021

ethics considerations which rehabilitation professionals know about.

382.    In retrospect, seeing how badly things went in September, 2018 on, School Year 2018-2019; Plaintiff was correct in her assumptions and actions.

383.    Therefore, as of June 22, 2018, and at all dates thereafter; Plaintiff had a duty to the students and parents; and a right; to continue at the Sarah Anderson School: first to provide summer compensatory services owed to her current students over the summer of 2018; and also to return to the school in September, 2018, to work for the full year, full time; to continue moving her students ahead in meeting their newly developed IEP Goals and Objectives; lawfully created as part of the Annual IEP Report process, in close collaboration with parents and staff.

384.    In SY 2017-18, Plaintiff had done an excellent job, objectively outperforming the prior therapist, as well as the one after her; through the use of results driven treatment; and by the use of highly effective and innovative techniques to enable dysgraphic students to develop functional written communication skills; which methodology Plaintiff had been developing over the past decade. Plaintiff had knowledge of the specific students, knew how to best positively engage them in therapy, how to enhance their overall classroom performance, and how to successfully integrate treatment into the school's educational practices.

385.    Conclusion: By terminating Plaintiff, Def.s caused themselves to intentionally violate IDEA and NYSED Ed. Law; through their intentionally depriving the students of a knowledgeable and known therapist, and of mandated services  their FAPE rights.

**Defendants Cause Impossibility of Mitigation:**
The **Significance of Harmful removal of NYCBOE Security Clearance to Future Employment and Work Prospects:**

386.    **NYCBOE as Sole Employer for Occupational Therapists specializing in School based services**: The NYCBOE is virtually the sole employer of occupational therapists whose clinical specialization is school-based therapy, across the city and boroughs; across public, charter, private, parochial and religious schools.

387.    This is due to the fact that NYCBOE is legally responsible to pay for these services for all students who are NYC residents, regardless of educational setting or location. In all cases, the NYCBOE Security Clearance is a mandatory prerequisite for employment in any mode or capacity. Loss of security clearance comes with an inherently defamatory assumption which, in this case, is and was the intent.

388.    NYCBOE directly employs therapists as official contractual "employees"; directly by RSA vouchers, both through individual parents, and through schools which have been released RSAs

Rubin v. NYCBOE et al
20-CV-10208    12/2021

for the entire student caseload; and indirectly through the massive system of for-profit vendors. Students with special education needs, not at public schools, are also provided Related Services, such as Occupational Therapy, through the same service, financing and employment structure.

389.    As of June 26, 2018, Plaintiff was 68 years old. It is almost impossible to obtain work at that age.

390.    Defendants refused to allow a reference, in November, 2018.

391.    Plaintiff continued to seek work, in a variety of settings, to no avail.

Index of Attachments to Part I. & Attachments

Attachments
Attachment #1    RSA-A Form Related Service Agreement, or RSA, page 1
Attachment #2    A Letter to Parents, June 21, 2018
Attachment #3    NYSED SEQA Notice of Investigation, April 9, 2019
Attachment #4    NYSED SEQA Investigation Report and Corrective Action Plans,
                    May 17, 2019
Attachment #5    Teacher Certification Lookup – Cullen
Attachment #6    BEHAVE! Picture, Cullen's student, 6/26/2918
Attachment #7    OT in the Summer, May 16, 2018
Attachment #8    PEP Meeting on Vendor Responsibility, August 23, 2017. 4 pages.
Attachment #9    ***NYCDOE/UFT 6/1/2015***.
Attachment #10   *UFT Topics in the News: SESIS*, 3 pages
Attachment #11   ***Gathering SESIS information***
Attachment #12   ***OSI No Further Action Memorandum***, August 20, 2018,
                    Composite version, 2 pages

All documents, complaints and any other materials previously submit under this case number, by Plaintiff Rubin, are hereby Amended and Annexed herein to this Second Amended Complaint.

Part I includes Lines # 1 through #391 and Pages 1 through 40.

## End of  Part I, Second Amended Complaint

Respectfully Submit,
        This 28th  day of December, 2021
                    *S | Lise Rubin*  Electronically signed.
                    Lise Rubin
                    677 Kent Ave.
                    Teaneck, NJ 07666
                    917-513-2630
                    OTL.NewYork@gmail.com

Cc: VIA ECF
        Elisheva Rosen
        Assistant Corporation Counsel
        Attorney for Defendants
        100 Church Street, Room 2-316
        New York, New York 10007
        212 (356-3522        erosen@law.nyc.gov